No. 24,140.

THE CITY OF WINFIELD, *Appellant*, v. THE COURT OF INDUSTRIAL
RELATIONS et al., *Appellees.*

SYLLABUS BY THE COURT.

1. NATURAL GAS RATES—*Power of Court of Industrial Relations and of Public Utilities Commission to Modify or Change Established Natural-gas Rates.* During the time the court of industrial relations was vested with the duties and functions of the public utilities commission, that court, and the commission prior to and subsequent to that interval, had power to set aside and change the rate for natural gas furnished to the inhabitants of the city of Winfield, notwithstanding the city's objection thereto, and notwithstanding the existence of a contract between that city and the party which supplied the natural gas, which contract had been made and promulgated by a city ordinance prior to the enactment of the public utilities law; and whatever might be urged against the impairment of such contract by the other party thereto, the changes in the rates and service by order of the state tribunal did not as against the city violate the contract clause of the federal constitution.

2. SAME—*Contracts Between City and Public Utility—City Acts as Agent of the State—Power of State Over Such Contracts.* In exercising the power of making contracts with public utilities, and in enacting ordinances with reference thereto, a city acts as an agent of the state in its governmental character, and it is within the power of the state to withdraw that authority and confer it upon another governmental agency, such as the court of industrial relations or the public utilities commission, and such later governmental agency has the power with the express or implied assent of the utility concerned to alter the contract and other incidental regulations theretofore established by the city.

3. SAME—*Supplying Gas to City—Supervision of Public Utilities Commission.* Where the gas supplied to a city in this state through a local distributing company is furnished by a gas transportation and sales company which has its chief sources of supply in Oklahoma, and which similarly transports and delivers gas to many other cities in Kansas, the rates and service in such city are subject to the original jurisdiction of the public utilities commission under its regulatory and supervisory powers conferred by statute.

4. SAME—*Installation of Devices for Regulating Gas Pressure—Order of Commission Valid.* The public utilities commission has power to order the installation of devices for regulating gas pressure, and the fact that its order to that effect is experimental, and the use of the pressure regulating devices only required for six months, does not affect its validity.

5. SAME. Under authority of statute the city of Winfield contracted in 1906 for natural gas at prescribed rates and pressure, and enacted an ordinance to the same effect. Under the powers vested by the public utilities act of 1911, and acts of 1919, 1920 and 1921, the court of industrial relations and

City of Winfield v. Court of Industrial Relations.

the public utilities commission made orders which changed the rates and pressure defined by the contract and city ordinances of 1906. The gas supply of Winfield is chiefly derived from a transportation company which similarly supplies other cities in that part of the state, and the rates and gas pressure in Winfield have a substantial and consequential effect on the rates and gas pressure in other cities. *Held,* that the matter of regulating gas rates and gas pressure in Winfield is within the original jurisdiction of the tribunal which exercises the powers conferred by the public utilities act and supplemental legislation.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed June 10, 1922. Affirmed.

*A. M. Jackson, J. E. Torrance,* and *S. C. Bloss,* all of Winfield, for the appellant.

*A. E. Helm,* of Topeka, for the appellees; *H. O. Caster,* of Bartlesville, Okla., of counsel.

The opinion of the court was delivered by

DAWSON, J.: The city of Winfield brings this appeal from a judgment of the district court of Shawnee county upholding an order of the court of industrial relations which increased the rates for natural gas which had been prescribed by ordinance in 1906, which rates were also prescribed by a contract of about the same date between the city and one Pattison, assignor of successive utility companies which have been supplying the city with that commodity pursuant to such ordinance and contract.

Another matter involved herein relates to the validity of an order issued by the public utilities commission after it was reëstablished and reinvested with authority over public utilities by the act of 1921. This order directed that a certain device for regulating and limiting the gas pressure be supplied to the patrons of the gas company in Winfield. It also prescribed a certain gas pressure, substantially less than that provided by the city ordinance of 1906. The district court declined to interfere with that order, and its propriety is also within the scope of this appeal.

The city's main contention is that these official state boards, the court of industrial relations and the public utilities commission, had no power to make the orders appealed from because such orders impaired the contract of 1906 between the city and Pattison and his assignees. Pattison had agreed to supply the city with gas at a rate not exceeding thirty cents per thousand cubic feet. The details of the contract and ordinance need not be stated. The order of the

state tribunal created certain distributing zones of the cities supplied by the Wichita Natural Gas Company, the trunk line company which transports, sells and distributes natural gas throughout that section of the state; Winfield, Arkansas City and neighboring towns were put in zone 1; Wellington, Wichita and others in zone 2; and Newton, Hutchinson and others in zone 3; and a charge of seventy-five cents per month per customer, plus a rate of fifty-six cents per thousand cubic feet, was prescribed for customers in zone 1, and higher graduated rates in zones 2 and 3, which were further away from the gas transportation company's sources of supply.

Did the state tribunal have power to make these orders? There can be no doubt that the public utilities law conferred upon it that power, unless the city is correct in its contention that the order impaired the contract of 1906 within the inhibitions of the federal constitution. In our own cases concerning orders of the state commission over rates and service of public utilities, it has not hitherto been necessary to decide this precise point, although we barely avoided it in *City of Cimarron v. Water, Light & Ice Co.*, 110 Kan. 812, 205 Pac. 603, because there the contract in question was made after the enactment of the public utilities act. Here the question must be squarely met and decided, because this contract was made in 1906, and the public utilities statute extending general state control over public utilities like gas companies and creating a state board to exercise that control was not enacted until 1911.

It goes without saying that under the inhibitions of the federal constitution the state may not enact a law which impairs the obligation of an ordinary contract between private individuals. Yet even this rule is not without its exceptions. (*Union Dry Goods Co. v. Georgia P. S. Corp.*, 248 U. S. 372, 63 L. Ed. 309; 9 A. L. R. 1423, and note.) It has also been declared many times that when the state authorizes one of its municipal corporations to make a contract with private parties or public-service corporations for a reasonable term of years, the state cannot by subsequent legislation impair that contract to the prejudice of the party with whom the contract was made, nor without the assent of such party thereto. The many cases declaring this principle are the ones here pressed upon our attention by counsel for the city. But these cases do not reach the matter here concerned. Here the state authorized its own subordinate governmental agency, the city of Winfield, to make a contract with Pattison and his assignees. Now the state by further legisla-

tion says in effect, "I resume this power and confer it upon another governmental agent, a public utilities commission or an industrial court, and I authorize it to act for me instead of my municipal corporation at Winfield." When the city of Winfield made that contract with Pattison it was acting as the agent of the state for the benefit of the people of that municipality. Until the public utilities law was enacted, the city and Pattison might have amicably changed that contract. In the act of 1911 the state put forward another agent clothed with power to deal with Pattison; and that agent of the state with the express or implied consent of Pattison's present assignee has abrogated and changed certain features of that contract; and neither the federal inhibition concerning the sanctity of contracts nor any other constitutional principle is violated thereby. This course of reasoning is pursued by most, if not all, of the courts which have had occasion to consider it. In the Cimarron case, *supra,* the leading cases with pertinent annotations which deal with this subject were cited. (See, also, *Sandpoint W., etc., Co., Ltd. v. Sandpoint,* 31 Idaho, 498, 173 Pac. 972, L. R. A. 1918F, 1106; *Arlington Board of Survey v. Bay State St. Ry.,* 224 Mass. 463; *North Wildwood v. Public Utility Comm'rs,* 88 N. J. L. 81; *Portland v. Public Service Commission,* 89 Ore. 325; *City of Salem v. Salem Water, Light & Power Co.,* 255 Fed. 295.)

Strictly speaking, these cases announce no new principle. The state creates governmental officers and agencies, clothes them with authority, alters that authority, resumes it and imposes it on other functionaries as experience may suggest. A good example of this is found in the creation of the board of railroad commissioners in 1883. That board was given regulatory authority over railroads, the only public utilities of importance in Kansas at that time. That board was abolished in 1898. It was recreated with the same or increased powers in 1901. The board and its functions were merged in the public utilities commission created in 1911. This commission was abolished in 1920, and its duties and powers conferred on the court of industrial relations created at that time. In 1921 the public utilities commission was reëstablished and reinvested with all its functions which included most of the duties and powers vested in the board of railroad commissioners by the act of 1901.

On an analogous subject, in *LaHarpe v. Gas Co.,* 69 Kan. 97, 76 Pac. 448, it was said:

"The general statutes relating to the government of cities generally place

the power to lay out and improve streets and public grounds, and to regulate their use, in municipal officers, but that is a power which the state may exercise either directly or through one of its agencies. In placing the control of streets and public grounds in cities, the legislature surrendered none of its own power, nor did it vest any rights to such cities as against the public. A city is a creation of the legislature—a subordinate agency of the state, which exercises only such power as the legislature confers, and for such period of time as the legislature in its discretion determines. The state gives, and the state can take away; and the legislature is at liberty to resume so much of the control of the streets and alleys and public grounds formerly exercised by the city as it deems best, and this without obtaining the consent of either the officers or the inhabitants of the city." (p. 103.)

The supreme court of the United States in *Pawhuska v. Pawhuska Oil Co.*, 250 U. S. 394, 63 L. Ed. 1054, a case substantially similar to the one we are here considering, held that no question under the contract clause of the federal constitution arises where the state first clothed one of its cities with power to grant a franchise to a gas company under terms prescribed by city ordinance, and afterwards transferred the city's authority over such matters to a state corporation commission which abrogated the rates and rules prescribed in the franchise contract made by the city, and prescribed higher rates and other rules of its own making. The supreme court of Oklahoma sustained the orders of the state commission (166 Pac. 1058) and the city sued out a writ of error to the federal supreme court. Mr. Justice Van Devanter stated the contention of the city of Pawhuska, which was practically identical with the present contention of the city of Winfield:

"The city contended in that court—and it so contends here—that at the time the franchise was granted it alone was authorized to regulate such charges and service within its municipal limits; that the legislature could not transfer that authority to the Corporation Commission consistently with the Constitution of the state; and that, in consequence, the act under which the Commission proceeded and the order made by it effected an impairment of the franchise contract between the city and the gas company, in violation of the contract clause of the Constitution of the United States." (*Pawhuska v. Pawhuska Oil Co.*, 250 U. S. 394, 396, 63 L. Ed. 1054.)

In the opinion showing that no federal question was involved and that the case would necessarily have to be dismissed, a pertinent excerpt from an earlier case, *New Orleans v. N. O. Water Works Co.*, 142 U. S. 79, was quoted:

"But further citations of authorities upon this point are unnecessary; they are full and conclusive to the point that the municipality being a mere agent of the state, stands in its governmental or public character in no contract

relation with its sovereign, at whose pleasure its charter may be amended, changed, or revoked, without the impairment of any constitutional obligation, while with respect to its private or proprietary rights and interests it may be entitled to the constitutional protection. In this case the city has no more right to claim an immunity for its contract with the waterworks company than it would have had if such contract had been made directly with the state. The state, having authorized such contract, might revoke or modify it at its pleasure." (p. 91.)

Counsel for the city argue that the enactment of the public utilities law of 1911 did not repeal the statute of 1903 (Gen. Stat. 1915, § 862) which conferred upon cities like Winfield the power to contract for and fix rates for natural gas and similar utility services, under which the Winfield ordinance and contract with Pattison were adopted. This contention is only measurably correct. The powers conferred on cities by that statute have been superseded and withdrawn in so far as they are inconsistent with the powers later conferred on the public utilities commission. In *Street Lighting Co. v. Utilities Commission,* 101 Kan. 774, 778, 169 Pac. 205, it was said:

"The cities of this state have always had the power to regulate and control their local public service corporations—assuming that the furnishing of lamp posts, etc., is a public service. (Gen. Stat. 1868, chapters 18, 19; Gen. Stat. 1915, chapters 17-20.) Cities still have that power except where they have been stripped of it by the public utilities act. (Laws 1911, ch. 238, § 40, Gen. Stat. 1915, § 8368; *Humphrey v. City of Pratt,* 93 Kan. 413, 418, 144 Pac. 197.) And where the utility service is furnished wholly or principally within one city, the power of control is expressly reserved to the city. (§§ 3 and 33, public utilities act.) If the local utility company and the city come to loggerheads, then the public utilities commission may take jurisdiction by a proceeding somewhat in the nature of an appeal or right of review. (Laws 1911, ch. 238, § 33, Gen. Stat. 1915, § 8361.)"

Counsel quote from a note to *Saratoga Springs v. Saratoga Gas, etc., Co.* (191 N. Y. 123) in 14 Ann. Cas. 614, which holds that rates fixed by statute can only be abrogated by the legislature, and cannot be altered by a subordinate body created by the legislature. This court has had to consider this point in *The State, ex rel., v. Postal Telegraph Co.,* 96 Kan. 298, where a telegraph company closed its station in the county seat of Hamilton county without the consent of the public utilities commission and in disregard of a statute of 1893 requiring all telegraph companies operating their lines through county-seat towns to maintain telegraph stations therein. The effect of the public utilities act upon that earlier statute was discussed and reference was made to cer-

tain unreported federal cases which had dealt with the effect of the enactment of the public utilities law upon the statutory rates on oil shipments, and it was said:

"The telegraph company was required to maintain its station at Syracuse, not on account of any remaining potency in the act of 1893, but because the public utilities act of 1911 had entirely superseded it, and that act dealt with conditions as it found them at the time of its enactment, crystallizing those conditions, rates, service, regulations and the like as they then prevailed, and made them subject to change, alteration and amendment by order of the commission. The necessary inference is that important changes materially affecting or likely to affect the convenience of the public were not to be made without the approval of the public utilities commission, except as its orders might be corrected by the courts. We hold, therefore, that the act of 1893 will be no obstacle to the abandonment of the telegraph company's office at Syracuse if the public utilities commission shall see fit, in the exercise of its sound discretion and with due regard to the rights of the public and of the telegraph company, to sanction it. The powers of the commission are no less comprehensive in dealing with telegraph service at county seats than elsewhere." (p. 308.)

Another contention of the city is that the utility which served it was one which was "operated wholly or principally" within the city of Winfield, which made it subject in the first instance to city control and not to the state commission except by appeal. (Gen. Stat. 1915, §§ 8329, 8361.) It is true that in Winfield the gas is distributed by a local corporation whose corporate activities are largely confined to that municipality; but it produces no gas nor has it any considerable source of supply except what it receives from the Wichita Natural Gas Company, the trunk-line gas transportation, distribution and sales company, operating in Oklahoma and into and through a score or more of towns in zones 1, 2 and 3, in southern Kansas. The principal order complained of in this lawsuit is the one which prescribes and classifies the rates in cities (like Winfield) in zone 1, which receive their supply of gas from the Wichita Natural Gas Company. It is perfectly obvious that if there is to be any reasonable state control of gas rates and gas pressure, the state commission must exercise control in the situation here presented. The rates and pressure at Winfield have a direct influence on what rates must be exacted in the other cities served by the trunk-line company. If the rates and pressure prescribed at Winfield unduly deplete the revenues of the utility, the other towns supplied by the Wichita Natural Gas Company would have to pay more than they should, or the company would have

to go out of business, and all the towns including Winfield would be deprived of this public-service commodity. In the case of the city of Scammon (*Street Lighting Co. v. Utilities Commission*, 101 Kan. 438, *Id.* 774, 166 Pac. 514, 169 Pac. 305) there was no relation between the public service being rendered by the Welsbach Company in Scammon, and any public service being rendered by that company elsewhere, and therefore the matter in controversy was vested within the governmental and corporate control of the city, except as it might come before the state commission by proceedings in the nature of appeal or review. But in this case the gas rates and gas pressure service in Winfield do have a very potent consequential effect on the rates and pressure which must prevail in other cities in zones 1, 2 and 3, and therefore these matters were properly subject to the original jurisdiction of the state commission. (*The State, ex rel., v. Water Co,,* 92 Kan. 227, 140 Pac. 103.)

Another contention of the city is that the state commission did not have power to order the installation of the pressure regulation devices. In view of the broad general powers conferred on the commission over public utility services, as well as by the enactment of chapter 239, Laws of 1919, this contention must be disapproved. Another objection is that the order was one of limited duration— for six months. With the expansion of governmental control over public utilities this form of regulation has become common and is less objectionable than orders which, perhaps upon insufficient information, might be promulgated without such limitation. In the governmental control of public utilities it can seldom be predetermined with certainty that a rate, a regulation, a service, will be compensatory, practical, satisfactory; and so experimental orders are proper. If time vindicates their wisdom and justice, their duration may be permanently established; if not, they may terminate without further action and without provoking needless litigation. In *Court of Industrial Relations v. Packing Co.*, ante, p. 501, it was said:

"Laws and orders fixing rates for a period of time for public utilities have been sustained to determine their effect upon the revenue of such utility. (*Wilcox v. Consolidated Gas Co.*, 212 U. S. 19, 55; *Northern Pacific Ry. v. North Dakota*, 216 U. S. 579; *Lincoln Gas Co. v. Lincoln*, 250 U. S. 256, 269.)" (p. 507.)

The other details covered by briefs of counsel have not been over-

looked, but need no discussion. It is said that there was no evidence to support the court's finding—

"13. That the amount of gas supplied each of the various towns by the Wichita Natural Gas Company affects the gas service of each of the other towns along said pipe line and drawing their gas from that common source of supply."

Mayhap there was no item of direct evidence on that specific point, but the whole plan and system of collecting and distributing natural gas to the cities of zones 1, 2 and 3 was explained to the trial court, and has been explained to us in the abstract and briefs of the parties, so that by deduction it is seen that the finding is obviously true, and indeed it is not and cannot be denied that the finding of fact is itself correct.

The record contains no error and the judgment is affirmed.