No. 25,208.

THE WESTERN DISTRIBUTING COMPANY, *Appellant,* v. THE CITY OF MULVANE, *Appellee.*

SYLLABUS BY THE COURT.

FRANCHISE CONTRACT—*Between Private Corporation and City—Gas Company to Furnish City Free Gas for Its Public Buildings—Contract Not Abrogated by Order of Industrial Court—Contract Annulled Only After Notice and Hearing Before Utilities Commission.* A contract between a city and a utility company that in consideration of granting it a franchise to supply natural gas to the inhabitants of the city and to lay its mains, laterals, pipes and other equipment in the streets, alleys and public grounds, the company would furnish the city with gas for heating and illuminating its public buildings, was not abrogated by a general order of the industrial court that certain rates were reasonable and might be charged to ordinary consumers

with whom no contracts had been made, and where it further appears that the validity and enforcement of the contract with the city had not been brought to the attention of the industrial court, or any hearing had thereon, and no finding or decision made that it should be set aside.

Appeal from Sumner district court; OLIVER P. FULLER, judge. Opinion filed July 5, 1924. Affirmed.

*F. S. Jackson*, of Topeka, and *Robert D. Garver*, of Bartlesville, Okla., for the appellant.

*W. W. Schwinn, E. J. Taggart*, and *John Bradley*, all of Wellington, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.:    This was an action by the Western Distributing Company to recover from the city of Mulvane $354.94 for natural gas supplied to and used by the city. The court sustained the defendant's motion for a judgment on the pleadings, and plaintiff appeals.

The pleadings show that on August 8, 1906, the city by ordinance granted a franchise to certain persons to construct and operate a gas plant in the city for a period of twenty years for the purpose of supplying natural gas to the city and its inhabitants, with the right to lay mains, service pipes and other equipment in the streets, alleys and public grounds of the city. It was stipulated that the grantees, their successors and assigns, in consideration of the franchise and rights and privileges granted, agreed—

"To furnish the city of Mulvane with natural gas for heating and illuminating the city building and other public buildings now or hereafter belonging to or under the control of said city during the term of this franchise without any charge therefor, if natural gas is furnished to anyone under the provisions of this ordinance. . . ."

The franchise has been assigned to the plaintiff and for a number of years it has been operating the plant, and prior to August 17, 1920, has furnished free gas to the city for heating and illuminating its public buildings. It appears that on June 30, 1919, a proceeding was instituted by the court of industrial relations, which had succeeded to the powers and functions of the public utilities commission, to investigate and regulate the supply of gas in certain cities, including Mulvane, and the rates to be paid by consumers. The parties appeared, hearings were had, and findings were made of what was just, fair and reasonable in the premises.

The utilities were required to install certain limiting devices, and pending the installation of these devices an interim rate was prescribed, and rates that should obtain and be in effect after the devices were installed. Exceptions as to rates were made in communities where local gas fields exist and gas piped directly into the distributing systems of the company. It was found that differences in rates should be made in the several communities in accordance with the distance of each from the main supply of gas, including the cost of transportation and operating expenses. To that end three zones were created, and the city of Mulvane was placed in the second zone, in which the rate was fixed at 58 cents per thousand cubic feet, with a customer's charge of 75 cents per month per customer. The industrial court retained jurisdiction of the case for the purpose of making future adjustments if the same should become necessary, and an order was made that the distributing company should put into effect the rates established by the court. It was alleged and appears to be conceded that no order was made by the court of industrial relations or any other authority expressly canceling and annulling the franchise contract, and evidently no consideration was given to it by that tribunal.

That gas was supplied to and used by the city is conceded, and the question in controversy arose upon a motion for judgment upon the pleadings. The question presented is, Did the general order of the industrial court, which established what was found to be a reasonable rate for consumers in the Mulvane zone, abrogate the franchise contract with the city to furnish gas in consideration of the rights and privileges conferred by the ordinances? It is argued that before a rate schedule could be set aside as unreasonable there must be an express finding by the rate tribunal that the one in existence is in fact unreasonable. As to ordinary consumers with whom the utility had no contract as to rates, the finding of the industrial court that the changed and increased rates were reasonable fairly implied a finding that the lower rates previously charged were unreasonable. There was a hearing before the industrial court participated in by the parties as to the reasonableness of existing rates, and the finding made, though somewhat general, is deemed to be a sufficient basis for the order made so far as ordinary noncontract consumers are concerned. But it is not sufficient to abrogate a contract rate in the absence of a consideration and finding by the industrial court, or the public utilities commission, which succeeded

the court, that such rate was unreasonable or illegal. While the contract rate is designated as the furnishing of free gas to the city, it was not in fact free, as it was agreed that such gas should be furnished in consideration for the granting of the franchise, with the privilege as alleged of occupying the streets, alleys and public grounds of the city, and the laying thereon of its mains, laterals, service pipes, reducing stations and service boxes. The opening and occupancy of the streets, alleys and public grounds for these purposes was a benefit to the grantees, and necessarily resulted in some inconvenience and loss or detriment to the city, and which furnished a good consideration for the contract. (*Landon v. Railway Co.*, 113 Kan. 628, 216 Pac. 309.) A valid contract of this kind may be made, and if it was legal it must be regarded as binding upon both parties until it is set aside by agreement or by some competent authority. It has been said by the United States supreme court in a case involving the effect of a contract rate for gas supplied to the city and its inhabitants that—

"It has been long settled that a state may authorize a municipal corporation to establish by an inviolable contract the rates to be charged by a public-service corporation for a definite term, not grossly unreasonable in time, and that the effect of such a contract is to suspend, during its life, the governmental power of fixing and regulating the rates. (*Home Teleph. Co. v. Los Angeles*, 211 U. S. 265,273, and the cases there cited.) And where a public-service corporation and the municipality have power to contract as to rates, and exert that power by fixing the rates to govern during a particular time, the enforcement of such rates is controlled by the obligation resulting from the contract, and the question whether they are confiscatory is immaterial." (*St. Cloud Pub. Serv. Co. v. St. Cloud*, 68 L. Ed. 559.)

The contract was made before the public-utilities law was enacted. In 1911 the legislature created a tribunal to regulate and control utilities like the one in question, then transferred it to the court of industrial relations, and later it was reconferred and vested in the public utilities commission. The enactment of the law vesting this property in the regulatory state board did not of itself operate to abrogate existing contracts. (*Kaul v. Telephone Co.*, 95 Kan. 1, 147 Pac. 1130.) The general rule that a regulation or law is not enforceable which impairs the obligation of an ordinary contract between private individuals has exceptions. It has been determined that such a contract made by a city, which is but an agency of the state, may be changed or abrogated by proper procedure without violating the contract clause of the federal constitution. (*City of*

*Cimarron v. Water, Light and Ice Co.,* 110 Kan. 812, 205 Pac. 603; *City of Winfield v. Court of Industrial Relations,* 111 Kan. 580, 207 Pac. 813; *Railroad and Light Co. v. Court of Industrial Relations,* 113 Kan. 217, 214 Pac. 797.) In the City of Winfield case it was said that—

"In exercising the power of making contracts with public utilities, and in enacting ordinances with reference thereto, a city acts as an agent of the state in its governmental character, and it is within the power of the state to withdraw that authority and confer it upon another governmental agency, such as the court of industrial relations or the public utilties commission, and such later governmental agency has the power, with the express or implied assent of the utility concerned, to alter the contract and other incidental regulations theretofore established by the city." (Syl. ¶ 2.)

In the Railroad and Light Company case it was held that if such contracts are prejudicial to or discriminate against the public, or operate to interfere with regulations necessary to the public welfare, they may be set aside by the state board. However, they may not be abrogated by the board without a consideration of these elements and a finding, after a hearing, that they operate adversely to the public welfare. As we have seen, they were not set aside by the passage of the utilities act, nor yet by the filing and publication of a schedule of rates. (*Kaul v. Telephone Co.,* supra.) In the Railroad and Light Company case it is held that such contracts cannot be waved aside by a mere declaration or a dogmatic invocation of the police power, but they may be abrogated under that power after a hearing, and it is found they operate to reduce the revenues to the extent that recoupment would have to be made at the expense of other customers. It was added:

"But if continued performance of the contracts would only affect the net profits or dividends on that portion of the power company's property devoted to performance of the contracts, then the public interest would not be affected, and there would be no occasion or excuse for the intrusion of the state's police power." (p. 229.)

Where the contract rate is challenged it devolves on the board to inquire first whether the city was given legislative authority to enter into the contract, and if so, whether its enforcement would be prejudicial to or would adversely affect the public. As already appears the franchise contract has not even been brought to the attention of the state board. It did consider the rates to be charged to ordinary customers with whom the company had no contracts. As indicating that contracts between parties were not considered or determined, there was a provision in the order in question that gas should not be

supplied to industrial consumers when it was needed by domestic consumers, and that such contracts should be filed with the industrial court for its approval. If contracts of that character require the consideration and approval of the board, certainly a subsisting contract for the supply of gas to the city cannot be annulled until the matter has been brought into consideration by the board in an orderly proceeding, a hearing had thereon, with an opportunity for interested parties to advance reasons or grounds for upholding the contract, including an opportunity to show that the interests and rights of the public do not justify its abrogation. Contract rights may not be swept away without notice or hearing and without giving interested parties the right of controverting by proof and argument the claimed grounds of annulment, and certainly it cannot be done where the franchise contract was not brought to the attention of the tribunal and where the parties were unaware that it was under consideration. Upon the record there is no implication that such a hearing has been had.

We have not considered questions as to whether the contract provision operates unjustly as against the plaintiff or the public. These are questions for the public utilities commission, and until set aside by the commission the contract governs as to the gas supplied to the defendant by the plaintiff.

The judgment is affirmed.