Railroad and Light Co. v. Court of Industrial Relations.

No. 23,588.

THE WICHITA RAILROAD AND LIGHT COMPANY, *Appellee*, v. THE COURT OF INDUSTRIAL RELATIONS et al. (THE KANSAS GAS & ELECTRIC COMPANY, Intervener), *Appellants*.

No. 24,139.

THE WICHITA RAILROAD AND LIGHT COMPANY, *Appellee*, v. THE COURT OF INDUSTRIAL RELATIONS et al. (THE KANSAS GAS & ELECTRIC COMPANY, Intervener), *Appellants*.

No. 23,589.

THE JOPLIN & PITTSBURG RAILWAY COMPANY, *Appellee*, v. THE COURT OF INDUSTRIAL RELATIONS et al. (THE KANSAS GAS & ELECTRIC COMPANY, Intervener), *Appellants*.

No. 24,228.

THE JOPLIN & PITTSBURG RAILWAY COMPANY, *Appellee*, v. THE COURT OF INDUSTRIAL RELATIONS et al. (THE KANSAS GAS & ELECTRIC COMPANY, Intervener), *Appellants*.

No. 23,587.

THE ARKANSAS VALLEY INTERURBAN RAILWAY COMPANY, *Appellee*, v. THE COURT OF INDUSTRIAL RELATIONS et al. (THE KANSAS GAS & ELECTRIC COMPANY, Intervener), *Appellants*.

No. 24,227.

THE ARKANSAS VALLEY INTERURBAN RAILWAY COMPANY, *Appellee*, v. THE COURT OF INDUSTRIAL RELATIONS et al. (THE KANSAS GAS & ELECTRIC COMPANY, Intervener), *Appellants*.

SYLLABUS BY THE COURT.

1. ELECTRICITY—*Contracts Relating to Rates for Electric Energy—Impairment and Nullification of Such Contracts by Public Utilities Commission.* Contracts concerning rates for electric energy to be supplied by an electric power company to a street railway and interurban railways are not inherently illegal, and are not subject to impairment or nullification under an order of the public utilities commission unless performance of those contracts at the agreed schedules of rates so materially diminishes or adversely affects the revenues of the power company that the other customers of the power company have to bear some portion of the burden resulting from such contracts, or are otherwise discriminated against or prejudiced on account of such contracts.

2. SAME. If the revenue receipts under such contracts only affect the net profits or dividends on that portion of the power company's property used and useful in serving the traction companies, and do not require recoupment at the expense of other customers, nor impair the service rendered to the public, there is no occasion or excuse for the intrusion of the state's police power to abrogate the contracts.

3. CONTRACTS—*Not Abrogated by Public Utilities Act.* The public utilities act does not automatically abrogate contracts between public utility companies. If such contracts do not violate some provision of the act, they remain in force in accordance with their terms.

4. SAME.—*Order of Public Utilities Commission Unreasonable and Void.* The evidence was sufficient to show that the order of the public utilities commission, which had the effect of abrogating the contract rates and which increased the rates to be paid for electric energy by the plaintiffs, was unreasonable and void.

5. ELECTRICITY—*Contract Rates for Electric Energy—Yielding a Net Profit.* Although a rate for electric energy supplied by a power company to a traction company may ordinarily and reasonably be prescribed so as to yield a net profit of 8 per cent per annum on the property used and useful in that service, yet a contract rate which for ten years yielded an average of 5.54 per cent per annum should not be nullified and a higher rate established, especially when there was no adequate showing that the contract rate would not continue to be profitable for the remainder of the contract term.

6. SAME—The financial showing disclosed by the evidence demonstrated that the power company's revenues derived from the contract rates did not adversely affect the rates or service to its other customers who were properly classified under different rate schedules.

7. SAME—*Increasing Rates—Basis for Order of Commission Establishing Increased Rate.* When an order of the public utilities commission establishing increased rates for electric energy is judicially challenged and it is shown that the increased rates were partly based upon estimates and conjectures of the future cost of fuel oil used in generating the electric power, it was not improper to show by the test of later experience that such estimates of future cost were greatly exaggerated, and that such estimates were not a fair basis upon which to found an order increasing the rates.

8. SAME. The temporary high price of fuel oil, which made up 90 per cent of the cost of generating electricity, but which did no more than cause a temporary loss of dividends, which high price was not likely to continue, was not ordinarily a fair and sufficient basis for increasing the rates for electric energy to be exacted by the electric power company, especially when the existing contract rates had been fairly profitable for a long period of years.

9. SAME—*Order Increasing Rates—Action by Aggrieved Party—Necessary Parties to Action.* A party aggrieved by an order of the public utilities commission increasing the rates which he is required to pay and abrogating his contract rates with a public utility company does not need to bring all the customers of the utility into court to entitle him to judicial redress.

10. SAME—*Action—Subsequent Developments—Procedure.* When a party by timely action seeks judicial redress against an order of the public utilities commission, it is not necessary that such action be abandoned and that he return to the commission when later developments arise, which, if foreseen by the commission, would probably have prevented the order being issued, or might cause the commission to rescind the order complained of.

11. SAME—*Informal Procedure Before Public Utilities Commission—Notice to*

*Interested Parties.* The public utilities commission may obtain evidence of facts and consider data and reports in an informal way, but before such facts, data and reports are made the basis of an order of the commission changing rates for utility service, such evidence should be submitted to the parties concerned and they should have a fair opportunity to show, if they can, that the facts, data, and reports are inaccurate, incomplete or fallacious, or not of controlling significance.

12. SAME. So long as a judicial trial *de novo,* not a mere appeal, is accorded to any party aggrieved by an order of the public utilities commission, the proceedings before the commission may be conducted without much regard to formality.

13. ORDER INCREASING RATES—*Investigation Undertaken on the Initiative of Public Utilities Commission.* The order of the public utilities commission under consideration was made pursuant to an investigation undertaken on the initiative of the commission; and *held* also that the utilities act furnishes judicial redress to any person aggrieved by an order of the commission, if timely invoked, regardless of whether such order complained of was made pursuant to the initiative of the commission or otherwise.

14. SAME—*Order is Mandatory.* The evidence shows and the terms of the order complained of clearly import that it was mandatory and not permissive.

Appeal from Shawnee district court; GEORGE H. WHITCOMB and JAMES A. McCLURE, Judges. Opinion filed April 7, 1923. Affirmed.

*F. S. Jackson, William A. Smith, D. R. Hite,* all of Topeka, and *H. L. McCune,* of Kansas City, Mo., for the appellants.

*T. F. Doran,* of Topeka, *Chester I. Long, J. D. Houston, Austin M. Cowan, Claude I. Depew, James G. Norton, Warren F. Wattles,* all of Wichita, and *Clyde Taylor,* of Kansas City, Mo., for the appellees.

The opinion of the court was delivered by

DAWSON, J.: These six cases, which are virtually but three, are appeals from judgments of the district court of Shawnee county enjoining a schedule of rates promulgated by the public utilities commission to be charged by a big electric power company for the electric energy supplied by it to three big traction companies.

These three traction companies, plaintiffs herein, are the Wichita Railroad & Light Company, which operates the street railway in Wichita; the Arkansas Valley Interurban Railway Company, which operates an interurban line between Wichita, Newton and Hutchinson; and the Joplin & Pittsburg Railway Company, which operates an interurban line in Crawford county and thereabout. These traction companies have heretofore been supplied with electric current under contracts with the intervening defendant power company.

The principal defendant in these lawsuits, the Kansas Gas & Electric Company, is a corporation which operates widely throughout southeastern Kansas, and which sells electric current for light and power to some 35,000 customers, most of these being small domestic consumers, but some 3,000 of these customers are supplied under varying and different conditions, so that the different schedules of rates are classified, thus:

Schedule A.—Residence lighting.
Schedule B.—Commercial lighting.
Schedule C.—Miscellaneous power at secondary voltage.
Schedule D.—Combination lighting and power.
Schedule E.—Obscure classification not here pertinent.
Schedule F.—Large power (such as supplied to plaintiffs).
Schedule G.—Coal mining.
Schedule H.—Oil-field power.
Schedule J.—Power to cities for resale.
Schedule K.—Municipal waterworks.

The other defendant herein is the public utilities commission, and while some of the matters to be considered transpired or were in litigation in the name of the court of industrial relations, it will be more convenient to designate this defendant as the public utilities commission, or the commission.

Sometime in 1919 the Kansas Gas & Electric Company applied to the commission for a raise in its rates for electric light and power service (which application did not ask or contemplate any change in the contract rates of these plaintiffs), and accordingly the commission made an investigation and on May 10, 1920, ordered new schedules of rates for electric light and power, some higher and some lower, to be charged to all the customers of the power company, under the various schedules except those under schedule F and another not here concerned. As to schedule F, the commission found specially—

"That the Kansas Gas & Electric Company has entered into contracts as follows:

"(a) A contract with the Wichita Railroad and Light Company dated May 2, 1910, for furnishing direct current for the operation of the street railroad of said company in the city of Wichita, Kansas, said contract expiring by its terms November 30, 1930.

"(b) A contract with the Arkansas Valley Interurban Railway Company dated May 20, 1910, for furnishing electricity for the operation of the railroad of said railway company, said contract expiring by its terms in twenty years.

"(c) A contract with the Empire Gas & Fuel Company dated June 10, 1918, for supplying electricity for the operation of the oil properties of the said Empire Gas & Fuel Company, which contract expires by its terms five years from the date thereof.

"(d) A contract with Joplin & Pittsburg Railway Company dated July 1, 1918, for furnishing electricity for the operation of the railroad of said railway company, which contract continues by its terms for a period of nine years.

"All of said contracts are on file with this court, and the court finds that each of the consumers of electricity mentioned in said contracts, receives service under conditions materially differing from the conditions under which other consumers receive electricity from the Kansas Gas & Electric Company, and that the schedules of rates filed by the Kansas Gas & Electric Company and now under consideration herein are not applicable to said four consumers. That as to said four consumers, the Kansas Gas & Electric Company should present to this court such changes in the rates to said four consumers as it proposes to make in the rates fixed in said contracts, in form applicable to said four consumers, consideration being given to the conditions under which they receive electricity under said contracts."

The fourth of these large customers, mentioned in subparagraph (c) above, was apparently supplied under schedule H and is not involved in these lawsuits.

Pursuant to this order of the commission the power company filed a proposed new schedule of rates for these plaintiffs, and after several hearings the commission made a finding that the contract rates under which the plaintiffs were supplied with electric power were discriminatory, unjust and unfair to the other consumers of the power company, and found that the proposed new rates were just, fair and reasonable, and on November 22, 1920, ordered—

"That the applicant company be given permission to file, establish and put into effect the following schedule or rates lettered F . . . and supplements thereto appropriately numbered, and that said schedules shall be made applicable to the business of the applicant transacted in supplying electric power to the Arkansas Valley Interurban Railway Company, the Joplin & Pittsburg Railway Company, the Wichita Railroad & Light Company. . . ."

This order in effect abrogated the contract rates under which these plaintiffs were supplied with power and substantially increased them. Following this order, and within 30 days, these lawsuits were begun. Each of the plaintiffs set up its contracts and the order of the commission abrogating them, alleged that the contracts were not discriminatory and did not cast an undue burden on other customers, that their contracts did not affect the public

welfare and consequently were not within the police power, and were protected from impairment by the federal constitution and the fourteenth amendment. They also alleged that the commission's findings that the contracts were discriminatory, unjust and unfair to other customers were not supported by evidence nor founded on fact, and that the new rates prescribed by the order of November 22, 1920, were unreasonable and unjust. It was also alleged that the order was largely based upon reports of the commission's engineer, clerks and accountants not introduced in evidence and upon which the plaintiffs were denied the right of cross-examination and a fair hearing.

The Kansas Gas & Electric Company, for whose benefit the order was made, intervened and answered with a general denial, and—

"(b) That prior to May 10, 1920, the power company filed with the commission its proposed schedule of rates for electric light and power; that by an order dated May 10, 1920, after a full investigation of the matters and things involved, the commission found that all existing rates and schedules of rates charged by this defendant for electric service (except certain rates not material in this litigation) whether said rates were contained in schedules or contracts, were unjust, unreasonable, unfair, unjustly discriminatory and unduly preferential, resulting in discriminating in favor of some consumers as against other consumers; and said commission found that the rates contained in the schedules attached to the order were just and reasonable, but that such schedules were not applicable to the Wichita Company, the J. & P. Company, the A. V. I. Company and the Empire Gas & Fuel Company because such four consumers received service under conditions materially differing from the conditions under which other consumers received electricity from the power company, and the commission thereupon directed the power company to present further schedules fixing the rates to be charged said last four mentioned consumers; that afterward, but prior to the order of November 22, 1920, the power company filed with the commission its application containing the charges it proposed to make to said four large consumers; that after the filing of such application, upon notice to said four consumers, a hearing was had in which all of said four consumers appeared and participated and after a full investigation and being fully advised the commission on November 22, 1920, entered the order of that date to which reference is made by the several plaintiffs, authorizing and permitting the power company to establish and put into effect the schedule of rates mentioned in said order."

The commission adopted as its own the answer of the power company, intervener.

On this joinder of issues these causes were tried. The evidence was voluminous and consisted of oral testimony, tabulations of figures showing the usual data regarding investment, depreciation, cost of service, gross and net return, etc. It would expand this opinion

Railroad and Light Co. v. Court of Industrial Relations.

beyond reasonable bounds and serve little purpose to reproduce much of the evidence here. Some features of the evidence were that the Wichita Street Railway and the Joplin company had been induced to sell and dispose of their own electric power plants to the power company in reliance upon these contracts, and that the Arkansas Valley Interurban Company had extended its railway lines in reliance on its contract and that its fiscal program was based thereon. It was also shown that the contract rates under which the Wichita Street Railway was served were not prejudicial to the other customers of the power company but that if the street railway company were not a customer the cost of service and the necessary charge to other customers would be higher than it was; that the cost of service to plaintiffs was largely dependent on the cost of fuel oil, which was abnormally high for some months prior to the making of the order; that the order was largely induced not because of the evidence presented to the commission at the public hearings but upon the report of the commission's own engineer, T. J. Strickler, and upon his estimate that fuel oil in the future would cost $2.50 per barrel, of which report the plaintiffs had no notice until several weeks after the order of November 22, 1920, was made. It was also in evidence that the contract rates had netted a fair average annual profit for the full duration of the contract periods. Another significant feature of the evidence was the fluctuation in the price of fuel oil, which made up about 90 per cent of the cost of producing electricity, and of the unusually high price of that oil during the pendency of the hearings, and of its rapid and extraordinary decline after the order was made and before the final submission and determination of these lawsuits in the district court.

The trial court, both judges sitting, made findings of fact and conclusions of law and rendered judgment in favor of the plaintiffs.

In the Wichita Street Railway's case, the findings of fact in part read:

"1. The court of industrial relations [or commission], in the hearing which resulted in the order of November 22, 1920, received and considered evidence which was not introduced at the hearing before the court and the plaintiff herein did not know of the existence of the same until January, 1921, and had no opportunity of cross-examination, denial, explanation or rebuttal of such evidence. The evidence referred to is the report of T. J. Strickler to the court, copy of which was introduced on the trial of this case. . . .

"2. . . . After certain proceedings were had regarding the rates to be charged other consumers, which it is not necessary to detail here, but which

are shown by the evidence, the court of industrial relations on April 3, 1920, made an order wherein it was recited that certain large consumers, being the plaintiffs in the pending actions and also the Empire Gas & Fuel Company, had been granted special rates under contracts and that it would be fair and just that such companies be extended the privilege of a further hearing upon the question of whether a uniform rate should be established or a new or different classification of rates be put into effect than those in use. It was ordered that said proceedings in docket No. 3,019, be continued until April 14, 1920, at which time said four large consumers as well as the applicant and other persons interested should be heard upon the question mentioned and particularly as to whether the contracts then existing between the applicant and said companies be continued in effect, and also whether the rates should be equalized and made uniform with other consumers. . . .

"3. The rates charged the plaintiff in this case by the Kansas Gas & Electric Company and in force at the date of the said order of November 22, 1920, were based upon and fixed by a valid and existing contract between the parties. The value of the investment of the Kansas Gas & Electric Company used to serve the plaintiff railroad company at the time of the hearing before the court of industrial relations was $135,000 and the company was reasonably entitled to earn upon that amount 12½ per cent per annum, being 8 per cent return on the investment and 4½ per cent for depreciation. Beginning in 1911 the percentage of return of the Gas & Electric Company under the contract with the plaintiff on an investment of $135,000 was 6.66; in 1912 it was 2.65; it reached the maximum amount in 1915 of 15.74 and then declined to 1.02 in 1919. In 1920 there was a loss of 14.24 per cent on the investment. The average return for the whole period was 5.54 per cent. The cost to serve the railroad company reached the minimum in 1914 of $19,257.58, and the maximum amount in 1920 of $65,693.42; the latter amount being an increase of nearly 50 per cent over the cost in 1919.

"4. . . . It appears that the cost of fuel oil was 90 per cent of the total expense of serving the railroad company. . . . The average price for the four full years was as follows:

| | |
|---|---|
| 1917 | $1.41 |
| 1918 | 1.71 |
| 1919 | 1.70 |
| 1920 | 2.53 |

"The minimum cost was 59c. a barrel in August, 1916, and the maximum $3.12 in October, 1920, the price declining quite rapidly from the latter date until the time of the trial of this action. . . . In testimony given by Mr. Ripley [vice president of the power company] before the court of industrial relations, September 20, 1920, he made computations as to cost of serving the plaintiff herein. He used a price of $2.76 a barrel for fuel oil in figuring the company's cost. . . . In the Strickler report (Ex. 19), which was the report introduced in evidence before the court of industrial relations without the knowledge of the plaintiff, Mr. Strickler, the engineer for the court, expressed the opinion that the average cost of fuel oil for the year 1920 would be $2.50 a barrel.

Railroad and Light Co. v. Court of Industrial Relations.

"5. The figures in Exhibit 41 show that the average price of fuel oil for three years 1917, 1918 and 1919 was $1.60. The average price for 1920 was $2.53. At the time of the trial here in June 16, 1921, the market value of fuel oil was about $1.00 and at the time of the argument on June 27-28, 1921, it was around 65c. per barrel. Taking the above figures presented by Mr. Ripley as the expected income from the proposed new rates and counting the fuel oil as 90 per cent of the cost of service and making computations on lower rates for oil, the following results are obtained:

"Cost of oil $1.38 per barrel. . . .
"Returns 32.3 per cent on investment of $135,000.
"Cost of oil $1.50 per barrel.
"Returns 30.3 per cent on investment of $135,000.
"Cost of oil $2.00 per barrel. . . .
"Returns 22.2 per cent on investment of $135,000.

"6. The conditions existing at the time of the order of November 22, 1920, taking into account the price of fuel oil for the three years preceding 1920, did not warrant an estimated allowance for that item of expense of more than $1.60 per barrel. With fuel oil at $2.76 as estimated by Mr. Ripley, or at $2.50 as estimated by Mr. Strickler, the engineer of the court, the rates fixed by the court of industrial relations in the order complained of were not unreasonable, and would not have furnished a too large percentage of return on the investment of the Gas & Electric Company and a reasonable amount for depreciation. The rates fixed by the contract between parties did not at the time of the making of the order or prior thereto for about three years, bring an adequate return to the Gas & Electric Company, and the rate allowed by the court of industrial relations, assuming its power to change the contract rate, was not unreasonable or unjust under the evidence offered before it of the then existing price of fuel oil and the future cost as estimated by Mr. Ripley or Mr. Strickler. Actual experience since the date of the order, however, shows that the estimate for fuel oil was much too high. . . .

"CONCLUSIONS OF LAW.

"1. In the proceeding before the court of industrial relations which resulted in the order of November 22, 1920, sought to be set aside herein, the plaintiff was entitled to a full and fair hearing; that by the receipt and consideration of the Strickler report, containing important information used by the court in its determination of the matter before it, without the knowledge of plaintiff and without the opportunity to cross-examine the author of said report, rebut his evidence or argue before the court the matters contained therein, the plaintiff was deprived of the full hearing contemplated by the law and for that reason the *prima facie* validity and reasonableness of said order is destroyed.

"2. The rates permitted and established by the order of the court of industrial relations of November 22, 1920, are unjust and unreasonable and for that reason are unlawful and void.

"3. The plaintiff herein is entitled to a permanent injunction against the enforcement of the order made by the court of industrial relations of November 22, 1920."

15—113 KAN.

In the case of the Arkansas Valley. Interurban Railway, the findings of fact recited that the investigation of the plaintiff's contract rates was held on the commission's own motion, and that a formal public hearing was held thereon pursuant to notice to the plaintiff, but that evidence (the Strickler report) was considered by the commission after the public hearing was concluded. Also—

"3. The rate from the Kansas Gas & Electric Company to this plaintiff existing at the date of said order of November 22, 1920, was based upon and fixed by a valid existing contract between the parties, as supplemented by the surcharge prescribed by the public utilities commission in 1918. . .

"5. The net earnings of the Kansas Gas & Electric Company from the service to the plaintiff for the year 1920 at the rate provided in their contract, dated September 7, 1915, with the addition of the surcharge prescribed by the public utilities commission in 1918, calculated upon the allocated valuation by the electric company of its property devoted to plaintiff's use of $140,000, would be 12.8 per cent, assuming 70c as the basic cost of fuel oil to the Kansas Gas & Electric Company; 10.8 per cent, assuming $1.00 per barrel as such basic cost; 9.149 per cent, assuming $1.25 per barrel as such basic cost; and 7.48 per cent, assuming $1.50 per barrel as such basic cost.

"6. The net earnings of the Kansas Gas & Electric Company from the service to the plaintiff for the year 1920 at the rate provided under schedule F, contained in the order in question, calculated upon the allocated valuation by the electric company of its property devoted to plaintiff's use of $140,000, would be 22.7 per cent per annum, assuming 70c per barrel as the basic cost of fuel oil; 20.7 per cent per annum, assuming $1.00 per barrel as the basic cost of fuel oil; 19.03 per cent per annum, assuming $1.25 per barrel as the basic cost of fuel oil; and 17.375 per cent per annum, assuming $1.50 per barrel as the basic cost of fuel oil.

"7. For a considerable period prior to November 22, 1920, and at that time and since said date, the cost of fuel has constituted ninety per cent of the total operating cost of the Wichita plant of the Kansas Gas & Electric Company in producing current for plaintiff."

[Conclusions of law as in the Street Railway's case.]

In the Joplin & Pittsburg Railway Company's case, the power company did not itself generate the electricity which it furnished to this customer but bought it from another company, The Empire Gas & Electric Company. The findings, in part read:

"3. The court of industrial relations, in the hearing which resulted in the order of November 22, 1920, in its docket No. 3532, received and considered evidence which was not introduced in the hearing before that court, and the plaintiff herein had no opportunity for cross-examination, denial, explanation or rebuttal of such evidence.

"4. In July, 1918, the plaintiff entered into a contract with the Kansas Gas & Electric Company for the purchase from the latter company of electric power for the operation of its interurban railway in the vicinity of Pittsburg

and Franklin, at a rate therein specified, which contract was existing at the date of the order herein complained of, of November 22, 1920, and by its terms was not to expire for a number of years thereafter. The rates in said contract were approved in September, 1918, by the public utilities commission.

"5. The total value of the property, used and useful, in the service by the Kansas Gas & Electric Company to the plaintiff is admitted by both parties to be $23,750. The court finds that said sum of $23,750 is the amount upon which the Kansas Gas & Electric Company is entitled to receive a fair return so far as its services to plaintiff are concerned. . . .

"7. During the ten months beginning September 1, 1919, and ending June 30, 1920, the plaintiff paid the electric company for current purchased by it $40,589.31, for which current the electric company paid the Empire District Electric Company $23,069.73 leaving a gross profit upon such resale of $17,-519.58. Deducting the losses of transformation (2%), transmission (8%), and cycle changing (16%), in the aggregate of $2,866.94, left to the electric company a net profit of $14,652.64, which, upon the admitted investment of $23,750, yielded a rate of 74 per cent annual return available to interest, depreciation and dividends. It is admitted that a return of 12½ per cent upon the fair value is a fair and reasonable return to cover both depreciation and income.

"8. Similarly computed, the period of one year from September 1, 1919, to August 31, 1920, the electric company received from the plaintiff . . . a net profit of $14,836.06, or a return of 62 per cent available to interest, return and depreciation.

"9. During the period from September 1, 1919, to November 30, 1920, the approximate date of the order complained of, . . . there was a net profit to the electric company of $13,036.66, or an earning upon its investment of 54 per cent available for return and depreciation. . . .

"11. For the energy furnished by the Empire District Electric Company to the power company for the months of July, August, September, October and November, 1920, the power company actually paid to the Empire District Electric Company the sum of $21,194.38. For the same period the plaintiff paid to the power company for the energy actually used by the plaintiff, $19,578.40, so that, during this five months' period there was an actual loss to the power company on the current furnished the plaintiff of $1,615.98. . . .

"13. In July, 1920, there was in existence a contract approved by the public utilities commission of this state between the Kansas Gas & Electric Company for the purchase of current which was to be resold to plaintiff and others, which contract had several years yet to run. In that month the Kansas Gas & Electric Company voluntarily agreed to increase the rate provided in such contract approximately 50 per cent. This agreement was put into effect and the new rates therein provided were charged from and after July, 1920. This agreement was first in parol, and thereafter evidenced by writing. Such agreement was not approved by the public utilities commission until the day after the order was made on November 22, 1920.

"14. The actual experience for the year immediately preceding November 22, 1920, the date of the order, shows that the return to the Kansas Gas & Electric Company was far in excess of the admitted fair return of 12½ per

cent on the admitted value of the property used and useful in rendering such service.

"CONCLUSIONS OF LAW.

"1. The order of the court of industrial relations of November 22, 1920, in its docket No. 3532, is void because it prescribes a rate which is unjust, unreasonable and excessive.

"2. The plaintiff is entitled to a permanent injunction against the enforcement of the order."

On motion of the power company, the trial court made additional findings in the Wichita Street Railway's case, which, in part, read:

"III. The amount of capital necessary to serve the plaintiff is $135,000, and the power company is entitled to earn 12½ per cent upon this amount from the revenues derived from the plaintiff, being 8 per cent for return upon the investment and 4½ per cent for depreciation.

"IV. The return to the power company upon its said investment of $135,000 for the years from 1917 to 1920, inclusive, as shown by plaintiff's exhibits, was as follows:

"For 1917, during which year the average cost of oil to plaintiff was $1.41 per barrel, the return was 2.45 per cent.

"For 1918, when the average cost was $1.71 per barrel, the return was 1.98 per cent.

"For 1919, when the average cost was $1.70 per barrel, the return was 1.02 per cent.

"For 1920, when the average cost was $2.53 per barrel, the company actually lost on said investment 14.24 per cent.

"V. The plaintiff paid the power company for power in 1920, $46,475.95. The cost of fuel alone to the power company to render this service to the plaintiff was $57,717.15. Including operating, labor and maintenance, it cost the power company to serve the plaintiff in 1920, $65,693.42, or a loss of 14.24 per cent upon the allocated investment. During the entire period the plaintiff has received power from the power company, 1911 to 1920, inclusive, the average annual return to the power company under its contract with plaintiff, upon the allocated investment of $135,000, has been 5.54 per cent."

Judgment was entered in favor of the plaintiffs enjoining the order of the commission which established the new rates under schedule F. Hence these appeals.

Before noting in detail the specific errors assigned, it will facilitate their consideration to make some pertinent observations affecting all of them. The new rates established under schedule F by the order of the commission had the effect of abrogating the contract rates under which the plaintiff traction companies were supplied with electric energy. Subject to an important exception, which will presently be noted, the contracts in question were protected from impairment by the federal constitution (U. S. Const., art. 1, § 10,

amendment XIV), and by the Kansas bill of rights, sections 1, 2 and 18, which have been construed to the same general effect. (*Winters v. Myers,* 92 Kan. 414, 421, 140 Pac. 1033; *The State v. Wilson,* 101 Kan. 789, 796, 168 Pac. 679.) The important exception is that if such contracts are prejudicial to or discriminate against the public or otherwise obstruct the state's authority to make laws and regulations reasonably necessary for the general welfare, they are not exempt from governmental control, but may be abrogated, curtailed or nullified through the reserved police power of the state. (*Atlantic Coast Line v. Goldsboro,* 232 U. S. 548, 58 L. Ed. 721; *Rail Coal Co. v. Ohio Industrial Comm.,* 236 U. S. 338, 59 L. Ed. 607; *Union Dry Goods Co. v. Georgia Pub. Serv. Corp.,* 248 U. S. 372, 63 L. Ed. 309, 9 A. L. R. 1420.) But contracts cannot be waved aside by mere lip service invocation of the police power, "by simply invoking the convenient apologetics of the police power," to use the language of Mr. Justice Holmes, in *Kansas Southern Ry. v. Kaw Valley Dist.,* 233 U. S. 75, 79, 58 L. Ed. 857. Before a contract can be interfered with through the police power, it must appear that the contract does in some measure affect adversely the welfare of the public.

"If the rates and pressure prescribed at Winfield unduly deplete the revenues of the utility, the other towns supplied by the Wichita Natural Gas Company would have to pay more than they should, or the company would have to go out of business, and all the towns including Winfield would be deprived of this public-service commodity." (*City of Winfield v. Court of Industrial Relations,* 111 Kan. 580, 586-7, 207 Pac. 813.)

If, for instance, continued performance of the contracts in question should bear so heavily on the power company that its general revenues would be depleted to the extent that recoupment would have to be made at the expense of the other customers, or would otherwise be reflected adversely in its rates or service to that portion of the public served by the power company, the contracts could and should be abrogated under the police power; but if continued performance of the contracts would only affect the net profits or dividends on that portion of the power company's property devoted to performance of the contracts, then the public interest would not be affected, and there would be no occasion or excuse for the intrusion of the state's police power. (*Kaul v. Telephone Co.,* 95 Kan. 1, 147 Pac. 1130; *Re Rockingham County Light & P. Co.,* P. U. R. 1917 F, 24.) In *Arkansas Natural Gas Co. v. Arkansas*

R. R. Comm. et al., decided March 19, 1923, the supreme court of the United States said:

"While a state may exercise its legislative power to regulate public utilities and fix rates, notwithstanding the effect may be to modify or abrogate private contracts . . . there is, quite clearly, no principle which imposes an obligation to do so merely to relieve a contracting party from the burdens of an improvident undertaking. The power to fix rates, when exerted, is for the public welfare, to which private contracts must yield; but it is not an independent legislative function to vary or set aside such contracts, however unwise and unprofitable they may be. Indeed the exertion of legislative power solely to that end is precluded by the contract impairment clause of the constitution. The power does not exist per se. It is the intervention of the public interest which justifies and at the same time conditions its exercise."

The contracts and contract rates, like all others, must be filed with the commission (Public Utilities Act, § 11, Gen. Stat. 1915, § 8338), changes and modifications of such rates must similarly be filed, and to be valid must receive the sanction of the commission (Public Utilities Act, § 20, Gen. Stat. 1915, § 8347), but the commission may and sometimes does give its approval to such contracts, and has done so in the Joplin company's case and in a certain modification of the original contract between the power company and the Arkansas Valley Interurban Company. If the contracts and contract rates violate any of the terms of the act they are or may be abrogated, otherwise they remain in force according to their terms.

With the foregoing elementary principles in view, we take up the errors urged on our attention.

1. Did the trial court err in its finding that the commission's order of November 22, 1920, was unreasonable and void? There was evidence which showed clearly that for the whole ten years' duration of the contract between the power company and the Wichita Street Railway it had produced a net average profit of 5.54 per cent per annum, and this notwithstanding the fact that owing to the abnormally high cost of fuel oil there was an actual loss during some months of the year 1920. There was no showing that during the relatively brief period when the service under the contract was furnished at a loss, that this loss either was or had to be cast upon the other consumers of the power company, or that the service at the contract rates did discriminate against them in any way. The loss did no more than temporarily affect the dividends of the power company. Furthermore, the evidence showed

Railroad and Light Co. v. Court of Industrial Relations.

that the new rates established by the commission were based upon the temporarily abnormal rates of fuel oil prevailing at the time the application for increased rates was being heard and upon the unwarrantably high estimates or conjectures of the future cost of fuel oil. In the operation of any public utility—a railroad for example—certain adverse conditions like floods and strikes may temporarily increase the costs of service or diminish its revenues, so that the business shows an actual loss; but if the rates for passenger and freight service are normally reasonable and ordinarily returned a fair profit over a stretch of years, the commission would hardly be justified in ordering an advance in the railroad rates because of such temporary adverse circumstances, especially if the loss did no more than affect the net profits of the railway company.

Touching the Arkansas Valley Company's case, the evidence was to the same general effect as in the street railway case, and did support the trial court's findings. As to the Joplin & Pittsburg Railway's case, the electric energy supplied by the power company was purchased from another concern, and the evidence showed that the contract rates were highly profitable notwithstanding the very questionable maneuver of the power company in voluntarily agreeing to a 50 per cent advance in the rates it paid for the electric energy which it resold to the Joplin company. There might be a question in a proper case, for example, if the patrons of the Joplin interurban company were complaining of the passenger or freight rates, whether the contract rates paid by the Joplin company to the power company were not altogether too high, since, notwithstanding they caused a loss for five months to the power company, they usually yielded a profit of 54 per cent to 74 per cent on the property used and useful in serving the Joplin company, and this, too, after the power company's voluntary assent to a 50 per cent advance on the rates paid by it to the company which supplied it with this electric power for resale. The contract rates between the power company and the Empire District company for the electric energy which it resold to the Joplin company were voluntarily raised 50 per cent by the contracting parties during the summer of 1920, but such increase did not receive the approval of the commission until after the order of November 22, 1920, was made, although this 50 per cent increased expense was included in the computations upon which the new schedule F was ordered. The contract rates between the power company and the Joplin company (contract dated July 1, 1918) were sub-

ject to change by the commission, but this should fairly be construed to mean subject to change only for good cause shown. Perhaps the order of the commission as regards this particular company arose from an assumption that it was proper to put the Joplin company into the same rate classification, schedule F, with the other plaintiffs. But the Joplin company was not a competitor of the other plaintiffs; it was not a competitor of any other customer of the power company so far as this record shows; and unless the contract rates, or even rates established by the commission, prejudicially affected the revenues of the power company, so as to react on or discriminate against the other patrons of the power company, its rates might very well be considered separately because of the different conditions under which it is served by the power company. Be that as it may, the evidence clearly established that the abrogation of this company's contract for the mere purpose or effect of enhancing the power company's then existing, highly profitable rates was unreasonable and the trial court's finding thereon was eminently correct.

The findings, which were supported by evidence, were that the power company was entitled to earn 8 per cent net on the value of its property and 4½ per cent to cover depreciation and renewals. As to the net earnings it may very well be that if the matter were not covered by contracts, and the question of prescribing rates by the commission were entirely open, 8 per cent for dividends on a well placed, well managed and well patronized and soundly financed public utility company would be quite fair and just. But certainly the utility company might be content with a less rate of dividends; it might make a valid contract for service though the anticipated dividends might be somewhat more, or somewhat less. Under the street railway contract the power company has had available for annual dividends from 15.74 per cent down to nothing, but averaging 5.54 per cent throughout its ten years' duration, and there was nothing in the evidence to justify a forecast that it will not do as well or better during the remainder of the contract term. (*Columbus Ry. & Power Co. v. Columbus*, 249 U. S. 399, 63 L. Ed. 669.) Conditions might arise where the contract rates would become altogether too high, so as to justify interference by the commission on behalf of the patrons of the traction companies. The financial showing did not justify the abrogation of the contract rates. It was conceded by all con-

cerned, including the commission, that these three plaintiffs, who purchased 4½ to 5 per cent of all the electric energy sold by the power company, were served under conditions so different from the general run of customers that they were properly placed under a separate classification, and the respective proportions of the power company's property used and useful in serving the plaintiffs was ascertained, so that it was readily susceptible of demonstration that the financial return to the power company under these contracts did not discriminate against its other patrons classified under the other rate schedules.

2. Complaint is made because the trial court considered evidence of facts and conditions arising subsequent to the date of the order. This evidence showed the phenomenal and precipitate decline in the price of fuel oil from the time of the commission's hearing in the autumn of 1920 to the time of the trial in the district court in the summer of 1921. In August, 1920, the price was about $2.76 per barrel; in June, 1921, it had slumped to 65 cents per barrel. Was the admission of this evidence erroneous? A lawsuit over a rate order made by the commission is a trial *de novo*. The issue is the reasonableness of the commission's order. Any competent evidence is admissible. It was shown that the commission's order was largely based, not upon the showing of financial results to the power company under the contract rates during the time they had been in force or for any considerable part of that period, but upon the forecast that the temporary high rates of 1920 would continue, and upon the estimate of the commission's engineer that the future cost of fuel oil would be $2.50 per barrel. It is doubtless and necessarily true that public utility rates must be based, in part, upon estimates of future receipts and expenditures; but when the reasonableness of those rates is drawn in question it seems only fair to test the accuracy of the basic estimates and forecasts by whatever evidence is available. We can make no better answer to defendant's contention that this evidence was inadmissible than to quote from the opinion of one of the learned trial judges in one of the present cases:

[JUDGE McCLURE] "This being a trial *de novo* either party could introduce evidence not offered before the commission, but is such evidence to be limited to conditions existing prior to or at the time of the hearing before the commission? A rate is made for the future and is based upon past, present and assumed future conditions. The past or present prices of material and labor, or other operating costs, merely furnish criterion upon which a rate-

fixing body may judge of future conditions. They are only of significance as they correctly foretell the future. If, after an order is made, the uncertainty of ascertaining future operating expenses becomes certain by reason of an experience under the rates ordered, why should not the prophecy give way to certainty? It may not be proper for a court to set aside an order of the commission upon the ground that facts and conditions subsequently arising make the order unjust, but it seems almost irrational for a court of equity to totally disregard evidence of known and definite conditions, capable of correct mathematical ascertainment, and determine the reasonableness of a rate upon speculation or conjecture as to what operating costs might be when it has available actual experience under the order. If experience shows the adequacy of a rate, should a utility be permitted to say that a court called upon to determine such adequacy should close its doors to evidence of facts definitely ascertained by experience and indulge in *a priori* reasoning, thus limiting itself to a process of speculation rather than considering the facts as they actually exist. I think the evidence was properly admitted, not as being conclusive in the premises, but as furnishing an aid to the court, together with all other evidence, in determining the reasonableness of the order when made. This rule appears to have been followed in *Northern Pacific Ry. Co. v. North Dakota*, 216 U. S. 579; *Knoxville v. Water Co.*, 212 U. S. 1, and numerous other cases, and its apparent fairness appeals to this court."

It is argued that such evidence is only admissible where the rate complained of is one of confiscation. We have yet to learn that an impairment of a contract right (except where justified by the police power) is not a species of confiscation. (12 C. J. 929-931.)

3. The next error urged relates to the trial court's ruling on defendant's objection to consideration of the plaintiff's cases because all the other 35,000 customers were not parties to the actions, "all of whose rights should be and are necessarily affected by any change in the rates." It is our duty to note patiently every point raised by the defendants and to comment on every one of these which requires discussion. But if all the 35,000 customers of a utility must be brought into court before a party aggrieved by the order of the commission can obtain judicial relief, then such onerous burden would be tantamount to a denial of justice. If this point is not absurd, it has at least no merit.

4. Defendant's next error raises the question whether plaintiffs should not have returned to the commission when the price of fuel oil declined rather than air their grievances in the trial court. If the plaintiffs had seen fit to acquiesce in the order of the commission and had put the new rates into effect for a few weeks or months, then, of course, when the fuel oil market went down to the old prices and showed some tendency to stay at the old levels, an

application for a reduction of rates would have been entirely proper. But certainly the plaintiffs were not compelled to forego their right of legal redress accorded by law, and the injunctive relief which they invoked was quite correct and in harmony with our procedure. Sometimes, where contract rates are not concerned or where the contract rates must yield to the police power for the general good, it is not uncommon for a party aggrieved by an order of the commission establishing new rates to commence his action to enjoin such order, yet not press his motion for a temporary injunction, but simply put the new rates into effect in the confident hope of showing experimentally that the order of the commission is unreasonable—biding his time to prove his cause of action. Sometimes, too, the trial court, while retaining jurisdiction of the cause for the time being, will refuse a temporary injunction and will order the challenged rates to be put in force for a short time, the better to determine by their operation and results whether the rates were reasonable or otherwise.

5. The next error assigned is twofold: (a) the admission of evidence that the commission through its engineer had made an investigation of the property of the power company; and (b) in deciding that the commission's order was not made under section 20 of the utilities act. As to the evidence touching the report of Strickler, the commission's engineer, and that this report was partly the basis for the order of November 22, 1920, we can see no reason why it was incompetent. Later we may consider other aspects of the use of this report; but the facts concerning that report—that it was considered by the commission, that it was not available for scrutiny by the plaintiffs at the time they were given a public hearing before the commission, that they never learned of it until some weeks after the order was made, that it was mislaid or secreted—all these incidents were competent on the question whether the plaintiffs had been given a fair hearing before the commission. It need hardly be interpolated here that even the admission of incompetent evidence where there is no jury to be misled is not necessarily prejudicial. (*Starbuck v. Kingore,* 112 Kan. 102, 210 Pac. 930.) This evidence was competent on the question whether the plaintiffs had been given a fair hearing before the commission. One of the commissioners testified that there had been a practice of considering such reports of its own engineer and accountants, and partly basing orders thereon without giving the parties affected an opportunity to ex-

amine them; and that he and an associate commissioner disapproved that practice, and ordered that in the future all such reports should be presented so that the parties concerned might know of them. It was also shown in evidence that another of the commissioners held the view, and said he acted on the assumption, that owing to the very broad powers conferred by law on the commission it was proper to consider any evidence from whatever source it came.

It may be helpful to straighten out this matter. It is not contemplated by law that proceedings before the commission need be conducted with the formality required of judicial tribunals, nor that the facts of which the commission may take note need conform to the law of evidence as understood by trained lawyers and judges. (*Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247.) In *Drainage District v. Railway Co.*, 99 Kan. 188, 210, 161 Pac. 937, it was said:

"Another contention of defendant is that it did not receive due consideration from the plaintiff's board before the order for the removal of the bridge was issued, and that the members of the board made the order pursuant to preëlection promises that they would not tolerate any bridge across the river having more than two piers. The circumstances were unusual. The people had suffered terribly by floods. The likelihood of their recurrence was obvious. Doubtless the public was wrought up about the matter, and the public knew that the army engineers had recommended the adoption of a two-pier plan for all bridges at Kansas City. But the members of the board testified that if they had been convinced that a bridge of more than two piers would not have increased the flood hazard they would have voted to sanction it, although they did not deny the preëlection agitation and their sympathy with it. In any matter of such general interest as flood protection in Kansas City it would be asking entirely too much of mere laymen to keep their minds open and uncommitted on such matters likely to come before them later for official consideration. Lawyers and judges trained in the art of jurisprudence, which requires a suspension of the judgment until all sides of a controversy have been fully considered, can do this; but if such high standards of mental neutrality are absolutely essential to qualify for membership in administrative boards, the whole system of administering governmental functions by boards and commissions of laymen will fail. The remedy for such prejudgments is not wanting, however. The redress of such grievances is usually taken care of when the courts are called on to test the reasonableness of the official orders of these boards."

The commission may gather its facts in the most informal way, and may and should avail itself of all reports and data gathered by its own staff of engineers, statisticians and accountants; but it is only fair that all such facts, data and reports, wheresoever gleaned,

should be presented in public so that the parties to be affected by the
commission's determination may show, if they can, by cross-exam-
ination or otherwise, that such data and reports are either inac-
curate, fallacious or incomplete, or not of controlling significance.
In no other way can the commission itself be sure that it is doing ap-
proximate justice to those concerned.  We have said that the for-
malities of a judicial court need not be followed, but this is really
no detriment to the parties; it facilitates the development of the
facts; and it is because of the free and easy procedure permissible
before the commission that a trial *de novo,* not a mere appeal, is
accorded in a judicial court from the orders of the commission.  So
long as a judicial hearing *de novo* is provided, it is not very import-
ant just what sort of evidence is received by the commission or how
it is received, if the parties concerned are apprised of it.  As was
said in *The State, ex rel., v. Mohler,* 98 Kan. 465, 472, 158 Pac. 408:

"If this power is abused, the courts are open to the aggrieved party, if not
by some statutory review, then by the extraordinary and prerogative remedies
of injunction or mandamus."

As to the point that the order of the commission was not entered
pursuant to the authority of section 20 of the utilities act, and which
appears to have given the trial court more concern than it merited,
and which occupies vastly more space in the briefs of counsel than
so relatively unimportant a matter deserves, it is sufficient to say
that the evidence disclosed, and the recitals in the orders of the
commission directing the power company to file a new schedule F
and the terms in which the order of November 22, 1920, was pro-
mulgated, demonstrate that the investigation of the contract rates
was undertaken on the initiative of the commission.  Indeed, this
fact was actually alleged in the power company's answer quoted
above.  The stoutness with which the defendants hang to the con-
tention that the proceeding was one under section 20 is based on
the fallacious assumption that if the new schedule F rates were
filed under that section, the plaintiffs could not be heard to com-
plain of them, that the new rates would automatically go into
effect and nullify the plaintiff's contracts without a hearing and
without any other opportunity to contest them than by institution
of new and independent proceedings before the commission for a
reduction of rates.  This is manifestly an erroneous interpretation
of the statute.  The rights of the plaintiffs, the rights of any person

in any case, cannot be so easily circumvented. (*Wichita Railroad & Light Co. v. Public Utilities Com.*, [U. S.] L. Co-op. Pub. Co.'s Advance Sheets Nos. 2 and 3, p. 52, Dec. 1, 1922.) As we read the utilities act, there is no order, permissive or mandatory, which the commission is authorized to make which cannot be challenged in a court of competent jurisdiction by any person aggrieved thereby, not only under various other sections of the act, but under the all-inclusive provisions of section 21 and section 40, which we only refrain from copying because of the voluminous space already devoted to these appeals. (*City of Emporia v. Telephone Co.*, 90 Kan. 118, 127, 133 Pac. 858; *The State, ex rel., v. Mohler,* supra; *Ohio Valley Co. v. Ben Avon Borough,* 253 U. S. 287, 64 L. Ed. 908.) It is also argued that the new rates established by the commission were merely permissive, not mandatory, and therefore not subject to challenge by injunction. Permissive? The power company was not required to charge and collect the new rates? The commission could not have compelled compliance even if no action to enjoin them had been begun in 30 days? Surely that argument is unsound. Were the new rates only permissive as to the plaintiffs? Did they, too, have permission to pay the new rates or to stick to their contracts as they saw fit? The order was mandatory; the order of November 22, 1920, had to be obeyed or challenged in court within 30 days.

The other errors formally assigned, touching the granting of temporary injunctions, overruling motions for a new trial and to set aside the findings, have all been noted, but they need no discussion.

The judgments are affirmed.

HOPKINS, J., dissenting.