**MOBILE GAS SERVICE CORP.**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

United Gas Pipe Line Co., Intervener.

**No. 11280.**

United States Court of Appeals
Third Circuit.

Argued May 19, 1954.

Decided Sept. 7, 1954.

Hastie, Circuit Judge, dissented.

William C. Chanler, New York City
(Winthrop, Stimson, Putnam & Roberts,
New York City, Johnston, McCall &
Johnston, Samuel M. Johnston, and Dan
T. McCall, Jr., Mobile, Ala., Elliott E.

Vose, Gerard Thomas, and William W. Karatz, Natchitoches, La., on the brief), for petitioner, Mobile Gas Service Corp.

William J. Grove, Washington, D. C. (Willard W. Gatchell, Gen. Counsel, Washington, D. C., Louis L. DaPra, Washington, D. C., Louis C. Kaplan, Rogers Heights, Md., Sherman S. Poland, Washington, D. C., on the brief), for respondent, Federal Power Commission.

Thomas Fletcher, Houston, Tex. (Wilbert O. Crain, Gen. Counsel, George D. Fiser, Shreveport, La., Vinson, Elkins, Weems & Searls, William T. Fleming, Jr., Houston, Tex., Wilkinson, Lewis & Wilkinson and C. Huffman Lewis, Shreveport, La., on the brief), for intervener, United Gas Pipe Line Co.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

McLAUGHLIN, Circuit Judge.

In this proceeding to review an order of the Federal Power Commission the basic question is whether the Commission is correct in holding that under the Natural Gas Act [1] a natural gas company can in effect wipe out a filed rate contract simply by filing an increased rate schedule. Substantially that is what the Commission considers to have happened to petitioner's contract with intervener.

Mobile Gas Service Corporation, the petitioner, is an Alabama distributor of natural gas. It receives its entire supply of that fuel from the intervener, United Gas Pipe Line Company, a Delaware corporation.[2] By a 1936 contract between it and United's predecessor and an agreement entered into in 1941 with United itself certain of Mobile's gas for resale industrially was to be supplied by United for 90% of Mobile's gross resale revenues. The contract provided that

the gas was not to be resold industrially for less than 16¢ per MCF (1,000 cubic feet) without United's consent. This agreement as amended by the 1941 contract was to continue in effect until 1962. Both contracts were filed with the Commission and became United's Gas Rate Schedule No. 20 and Supplement to that Schedule No. 7.

In 1946 United agreed with Mobile to a proposed arrangement between Mobile and Ideal Cement Company whereby the latter could be supplied with its industrial gas needs by Mobile for 12¢ per MCF for a period of ten years provided total deliveries remained between 100,001 and 400,000 MCF per month. In accordance with this United consented to accept the percentage rate of Mobile's sales to Ideal though this would be less than the minimum of 16¢ per MCF. United also agreed at that time to reduce the price of industrial gas to Mobile from 90% of the latter's gross resale revenues to 80% up to 41,667 MCF per billing month and 90% in excess thereof. Those agreements were filed with the Commission as Supplements No. 9 and No. 10 to United's Rate Schedule No. 20. Mobile then consummated its proposed contract with Ideal Cement Company to supply gas to the latter for ten years at 12¢ per MCF. The Alabama Public Service Commission approved that contract. Not only United but the Commission recognized the contract as late as July, 1952 when the Commission allowed United to substitute in its filed tariff a flat rate of 10.7¢ per MCF in place of the percentage rate Mobile had been paying. As United advised Mobile, this substitution was made under the Commission directive to convert from percentage to fixed sum and was almost identical with the amount the Mobile percentage rate actually figured.[3]

1. 52 Stat. 821–833, 15 U.S.C.A. §§ 717–717w.

2. Jurisdiction is obtained by reason of Section 19(b) of the Natural Gas Act. 52 Stat. 831, 15 U.S.C.A. § 717r(b).

3. In Tyler Gas Service Co. v. United Gas Pipe Line Co., D.C.Tex., Dec. 23, 1953, unreported (on appeal, 5th Cir.), United had agreed to just such an arrangement as Mobile made with Ideal—that is the furnishing of natural gas at a reduced rate. There the period was sixteen years.

On June 24, 1953, United filed with the Commission proposed increased rates, including a rate of 14.5¢ per MCF for industrial use gas for Mobile. On July 10, 1953, the Commission ordered a hearing on the lawfulness of those rates, suspended them pending the hearing with the exception of the new Mobile rate, and ordered that hearing to be consolidated with an earlier proceeding investigating all of United's rates. The new rate for Mobile being for industrial use was not subject to suspension under Section 4(e) of the Act. As a result it became operative July 25, 1953. Mobile, on July 16, 1953, attempted to intervene in the consolidated proceeding. On August 4, 1953, it filed a petition with the Commission setting up the above situation and asking the Commission to amend its order of July 10 so that United's new filing in so far as it affected the Ideal contract would be rejected and the 14.5¢ rate would not be permitted to take effect. In the alternative it requested a hearing on the lawfulness of the filing of that rate and asked that if Mobile was obligated to pay United the increased rate, United be directed to hold those payments subject to refund to Mobile in the event the new rate was ultimately determined to be unlawful. At that stage no action had been taken on Mobile's application to intervene and the new rate had been governing since July 25th. As a consequence Mobile amended its petition and urged the Commission that it be made a separate cause. That prayer was granted as was United's later petition to intervene in the new proceeding. On December 7, 1953 the Commission on the pleadings denied the prayers of Mobile's petition and dismissed it. On February 4, 1954, the Commission refused rehearing to Mobile. This petition for review of the Commission's decision followed.

Mobile's main point is that its United contract with respect to Ideal is a valid agreement which cannot be set aside by United's unilateral action of filing an increased rate schedule. It frankly recognizes the Commission's paramount authority and concedes that if after a proper proceeding the Commission found the contract rate to be against the public interest it could modify it or set it aside entirely.

The Commission contends that where a natural gas company files a rate schedule under 4(d) of the Act that rate is to be charged unless suspended initially or disapproved finally by the Commission after investigation and hearing; rates for industrial use not being subject to suspension when filed become effective thirty days thereafter until finally passed upon by the Commission. The latter insists that even where as here the rate conflicts with an admittedly preexisting filed contract the distributor is given no chance to defend its contract, on which it has made approved commitments, be-

In that suit there was a denial of an application for an injunction to prevent United from moving before the Commission for permission to collect its new rate for domestic use gas until the reasonableness of that rate had been finally determined by the Commission. There was a contract involved but it had already been modified in what seems to have been an adversary proceeding. According to the opinion of the district judge the " * * * plaintiffs concede that the Commission on final hearing may fix the rates at a figure which it determines to be reasonable, which may be at variance with and in complete disregard of the contract rates, * * *." The all important question before us of whether there should be a hearing on the reason-

ableness of an existent unchanged approved contract prior to the acceptance for consideration of the new rate and prior to the determination of the reasonableness of that new rate was not before the court.

It should be emphasized also that the fact that Tyler concerned a rate for sale of gas for domestic use of itself sets that action apart from the issue of this appeal. In Tyler under Section 4 (e) the Commission could and did suspend the effective dates of the increased rates for five months after which period it could order any subsequent collections to be held subject to refund in the event the new rates were ultimately found to be unlawful.

fore that contract is to all practical purposes abrogated.

It is undisputed that under the ordinary 4(e) proceeding which the Commission has instituted with reference to the new rate schedule involved, the dispositive question before the Commission is whether the increased rates are just and reasonable. 4(e) makes this plain when it says:

"* * * At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the natural-gas company, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible."

In other words if in the pending hearing United can show that its new filed rate for Mobile is reasonable that ends the matter and the new rate stands. No consideration will be given to the accepted contract, the circumstances under which it was entered into, the long term commitments sanctioned by the Commission and whether the rate fixed by it is unreasonable and against the public interest under the facts. What petitioner is endeavoring to do is have its contract passed upon in the first instance prior to authorization for filing of United's new rate and the consideration of whether that rate is currently reasonable.

The Commission maintains that 4(d) of the Act [4] upholds its stand. That section provides, as far as we are primarily concerned, that "no change shall be made by any natural-gas company in any such rate * * * or *contract* relating thereto, except after thirty days' notice to the Commission and to the public." (Emphasis supplied.) This means, according to the Commission, that since under 4(e) it does not have the power to suspend an industrial use gas rate, United can fundamentally cancel the Mobile contract despite the fact that as of now Mobile is bound for its duration to Ideal, subject only to the Commission later passing finally upon the rate. And in the Commission thought this can take place without any statutory notice to Mobile or an opportunity for Mobile to be heard regarding its contract rate. The practical result of this is that Mobile in living up to its contract with Ideal is supplying natural gas to that company for 12¢ per MCF and may well be forced to continue to do so until the expiration of its contract in 1956. Meanwhile Mobile must pay United 14.5¢ per MCF for the same gas it delivers to Ideal though its contract with United has never been questioned by the Federal Power Commission or in any way construed to be against the public interest.

The Commission and intervener rely to a large extent upon Union Dry Goods Co. v. Georgia P. S. Corp., 1919, 248 U.S. 372, 39 S.Ct. 117, 63 L.Ed. 309, and Midland Realty Co. v. Kansas City Power & Light Co., 1937, 300 U.S. 109, 57 S.Ct. 345, 81 L.Ed. 540. The first case is quoted by the Commission as holding in 248 U.S. at page 375, 39 S.Ct. at page 118: "That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court." The principle stated is of course sound law and is expressly uncontroverted by petitioner. In the Union litigation there had been a

---

4. Section 4(d) of the Act reads as follows:
"Unless the Commission otherwise orders, no change shall be made by any natural-gas company in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the thirty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published."

hearing before the Georgia Commission on the question of the reasonableness of the contract rates. The Commission found that they were unlawfully discriminatory. Here, as we have seen, Mobile had no opportunity to defend the contract rate prior to the new rate coming into being.

Midland does lend some support to the position of the Commission and the intervener. But there the rates filed by the utility were not opposed and were permitted by the Missouri Utility Commission without hearing.[5] Far more important than that the decision is based upon a state court interpretation of a state statute. The question litigated and passed upon was whether a Missouri statute as construed by the Missouri Supreme Court violated the federal constitution. That sort of problem is not presented in this action.

Another case involving a state court explanation of a state law is Wichita R. & Light Co. v. Public Utility Commission, 1922, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124.[6] That came into the federal courts through diversity of citizenship and as far as it goes affords strong help to petitioner. In it the Kansas Commission without any finding of unreasonableness and despite a duly filed contract for the sale of electric power, authorized a surcharge. The railroad had appeared in the Commission proceeding and had objected. The matter was removed to the United States District Court which restrained execution of the Commission's order.[7] The Eighth Circuit reversed.[8] The Supreme Court upheld the district court, quoting with approval from the opinion of the Kansas Supreme Court in Kaul v. American Independent Telephone Co., 1915, 95 Kan. 1, 147 P. 1130, 1131 where it is stated that:

" * * * The passage of the act did not automatically overthrow contracts, nor set aside schedules of rates which had been agreed upon. Neither did the fact that the defendant published and filed a schedule of rates with the public utilities commission abrogate the contract. In any event, rates previously agreed upon between utilities and patrons will continue in force until the commission has found them to be unreasonable and has prescribed other rates."

The Kansas procedure as to rates bears great similarity to the Natural Gas Act formula. Under Section 20 of that state's public utility statute[9] a public utility may file higher rates. Section 13 of the law empowers the Commission to set aside rates which after hearing have been found to be unreasonable. It is under the parallel provision in the Natural Gas Act, Section 5(a), that petitioner contends the Commission should have functioned in passing upon United's attempt to obtain a higher rate for its gas sold to Mobile for the industrial user Ideal. Section 5(a) reads:

"Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any rate, charge, or classification demanded, observed, charged, or collected by any natural-gas company

---

5. A very real distinction exists between the position of the realty company in Midland and that of the present petitioner. Hearings were held on similar contracts and the latter found unreasonable prior to the utility company's suit against Midland being disposed of and Midland had not appeared in those hearings. In other words Midland made no attempt to attack the new rate directly before the Commission but contented itself with raising a defense in a collateral proceeding brought by the utility company.

6. See also Attleboro Steam & Electric Co. v. Narragansett Electric Lighting Co., D.C.R.I.1924, 295 F. 895, construing a similar Rhode Island statute.

7. Wichita's motion for judgment on the pleadings was granted. There was no reported opinion.

8. 8 Cir., 1920, 268 F. 37.

9. Public Utility Law of Kansas, Session Laws of 1911, c. 238.

in connection with any transportation or sale of natural gas, subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order: *Provided, however, That* the Commission shall have no power to order any increase in any rate contained in the currently effective schedule of such natural gas company on file with the Commission, unless such increase is in accordance with a new schedule filed by such natural gas company; but the Commission may order a decrease where existing rates are unjust, unduly discriminatory, preferential, otherwise unlawful, or are not the lowest reasonable rates."

Section 5(a) was before the Tenth Circuit in Colorado Interstate Gas Co. v. Federal Power Commission, 1944, 142 F. 2d 943, 954, affirmed 1945, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206. In that case on complaint of the City and County of Denver and the State of Wyoming the Commission held that existing rates and contracts were unreasonable. The gas companies claimed that the finding was not founded on substantial evidence.

The Court said:

" * * * The passage of the Act did not automatically overthrow the contracts into which these companies had previously entered. Neither did it ipso facto set aside the schedules of charges upon which they had agreed. Such rates and charges could be modified only after an express finding of unreasonableness. Wichita R. & Light Co. v. Public Utilities Commission, 260 U.S. 48, 43 S.Ct. 51, 67 L.Ed. 124; Allen W. Hinkel Dry Goods Co. v. Wichison Industrial Gas Co., 10

Cir., 64 F.2d 881. And the right of the Commission to make a finding of unreasonableness depends upon the existence of the fact. In the absence of substantial evidence to show that the rates and charges in existence are unreasonable, a finding to that effect constitutes the arbitrary exercise of power by administrative fiat and cannot stand. Interstate Commerce Commission v. Louisville & N. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431."

The Commission suggests that the Colorado decision is not applicable because the proceedings were under Section 5 but we fail to note any contradiction of the court's statement that filed contract rates and charges can only be set aside on an express finding of unreasonableness which in turn specifically follows the very opinion (Wichita) that the Commission asserts turns on a peculiar Kansas law. Actually the Commission time and again insists that it does not claim that the Congress in the Natural Gas Act intended to set aside contracts completely. It states flatly that the Act shows no such thought. Nevertheless on the theory of "scheme of regulation" it argues that it be permitted to construe Section 4(d) so that in reality that consequence is obtained. In F.P.C. v. Niagara Mohawk Power Corp., 347 U.S. 239, 74 S.Ct. 487, 493, the Supreme Court made it abundantly clear that such authority "requires clear authorization", which is absent from the Natural Gas Act. In the Niagara Mohawk litigation the query was whether the Federal Water Power Act of 1920, 16 U.S.C.A. § 791a et seq., had abolished private proprietary rights, existing under state law, to use waters of a navigable stream for power purposes. The Supreme Court interpreting that statute said, 347 U.S. at page 251, 74 S.Ct. at page 494:

" * * * We find nothing in the Federal Water Power Act justifying such an interpretation. Neither it, nor the license issued under it, expressly abolishes any existing pro-

prietary rights to use waters of the Niagara River. \* \* \* On the contrary, the plan of the Act is one of reasonable regulation of the use of navigable waters, coupled with encouragement of their development as power projects by private parties."

So here, the Natural Gas Act does not expressly permit existing contract rights to be abolished by a mere unilateral filing of new rates. The plan of the Natural Gas Act is likewise one of reasonable regulation, as evidenced by the fact that the Commission itself cannot change an existing contract rate under Section 5 (a) without first finding that such rates are unreasonable.

■ Beyond question the Commission's action in this instance would result in further impairment of petitioner's common law rights. As the Supreme Court stated in Texas & Pacific Ry. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553, a case cited by intervener but interpreting the Interstate Commerce Act:

" \* \* \* a statute will not be construed as taking away a common-law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory."

See Shaw v. Railroad Co., 1879, 101 U.S. 557, 565, 25 L.Ed. 892; American District Telegraph Co. v. Kittleson, 8 Cir., 1950, 179 F.2d 946, 953; 3 Sutherland, Statutes and Statutory Construction (3rd ed. 1943) 164–182.

■■ Nor is a rate contract automatically nullified merely because the return is low. In this instance there seems no doubt but that the Ideal Cement account represented important new

business to Mobile and to United and that the long range price concession was made in order to obtain it. Cf. Arkansas Natural Gas Co. v. Arkansas Railroad Commission, 1923, 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705; Wichita Railroad & Light Co. v. Court of Industrial Relations, 1923, 113 Kan. 217, 214 P. 797. And the fact that the Commission can change the contract does not render it void for lack of mutuality. Southern Utilities Co. v. City of Palatka, 1925, 268 U.S. 232, 45 S.Ct. 488, 69 L.Ed. 930; Hinkel Dry Goods Co. v. Wichison Industrial Gas Co., 10 Cir., 1933, 64 F.2d 881.

■ With reference to the pertinent legislative history regarding such contract as before us, all three of the parties quote the colloquy between Congressman Halleck and Mr. Booth, appearing for the Illinois Public Service Commission on the bill which immediately preceded the Natural Gas Act. The accurate report of this reads:

"Mr. Halleck. Of course, it is your idea that if this bill should pass and the Commission be given the authority contemplated in this bill, that the contract *could* be superseded or invalidated insofar as attempt to fix the rates of charges is concerned?

"Mr. Booth. That certainly would be my position and we certainly would ask the Federal Power Commission promptly to consider the question as to whether or not the Natural Gas Pipeline Co. of America is earning an unfair return upon the fair value of its property." (Emphasis supplied.)

Hearings, House Committee on Interstate and Foreign Commerce, 75th Cong. 1st Sess., on H.R. 4008, at page 43.

The reasonable inference from the above is identical with petitioner's theory, namely, that the Commission has the power to eliminate a private contract; not that the latter is automatical-

ly destroyed by the unilateral action of a party thereto.[10]

There is no mention in the debates of Congress that the Act was ever intended to permit a contracting party to eliminate its existing contracts simply by giving thirty days' notice to the public and to the Commission. Instead the Act was stated to contain the "usual provisions * * * such as we find in all regulatory measures enacted by Congress",[11] and according to the Committee report, there was "nothing novel in its provisions."[12] It should also be noted that there was virtually no opposition to the bill from any source.[13]

The Commission itself in its brief says:

"The reports of the Federal Trade Commission on the natural-gas industry abound with references and data concerning the contracts of gas companies most of them for long terms. It was at the time of the passage of the Act, and is now, a common and usual practice for such gas companies to contract for all as between consumers or localities; for the requirement that the schedules be kept open for public inspection; for the power of the Commission to suspend the rates where deemed unduly high. The bill covers the question of accounting, following standard lines; of giving the Commission the power to control the accounts, including the depreciation account; and of requiring the gas companies under the regulation of this bill to conform to those accounting practices.

\* \* \* \* \* \*

"The bill makes provision for complaints and provides for hearings and has the usual provisions in reference to the production of testimony and rehearings by the Commission on petition, court review of the orders of the Commission, and, a rule, that the findings of the Commission, if supported by substantial testimony, are conclusive upon courts in connection with questions that may be taken to courts.

"Those are what might be called the principal provisions of the bill."

---

10. The intervener cites Armour Packing Co. v. United States, 1908, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681, for the point that Congress intended the scheme of the Act to replace every other device, including contract provisions. That case was under the Elkins Act amendment to the Interstate Commerce Act, 49 U.S. C.A. § 1 et seq. As the opinion itself states that amendment was adopted to make certain that all shippers be given the same treatment with one rate for a similar carriage of freight. The court also made clear that the Interstate Commerce Act contained no provision for the filing of contracts with shippers. The lack of recognition of that type of agreement in the Interstate Commerce Act was for the consideration of Congress stated the Court. Commenting on the omission of the Interstate Commerce Act to provide for private contracts the Court said, 209 U.S. at page 82, 28 S.Ct. at page 435: "It may be that such contracts should be recognized, giving stability to rates for limited periods; that the contracts being filed and published, and the rate stipulated known and open to all, no injustice would be done." As we have seen this possible course outlined by the Supreme Court in Armour has been followed in the later Natural Gas Act.

11. 81 Cong.Rec. 6722 (1937):
"Mr. Lea: * * *
"There are the usual provisions. Without attempting to go into detail, what I call usual provisions are those such as we find in all regulatory measures enacted by the Congress. This bill contains, for instance, administrative provisions; for rules affecting just and reasonable rates; for the power of the Commission to fix maximum or minimum rates or a specific rate after hearing; for the rule against discriminations and preferences

12. H.Rep.No.709, 75th Cong., 1st Sess., p. 3. See Colorado Interstate Gas Co. v. F.P.C., 1945, 324 U.S. 581, 601, 65 S.Ct. 829, 89 L.Ed. 1206.

13. 81 Cong.Rec. 6725 (1937):
"Mr. Mapes: Mr. Chairman, as far as I know, there is no opposition to this bill. I do not know of any member of the House or anyone else who opposes it. It is supported by the public utility commissions of the States and by all public bodies, as far as I know, who have anything to do with or have given any particular attention to the question of the distribution and sale of natural gas to the consuming public. As a matter of fact, my attention has not been called to any opposition to it, even on the part of the gas companies themselves."

sales or transportation of natural gas. Those companies which sold otherwise were exceptions."

This being so one would think that there would be at least some debate on a provision which provided for the lawful unilateral cancellation of that type of agreement if Congress had that in mind.[14]

The Commission also makes much of the provision in Section 4(e) which prohibits the Commission from suspending rates for the sale of natural gas for resale for industrial use. The purpose of this provision, however, as stated by the Congressman who introduced the amendment, was "to prevent suspension in cases of industrial use *where there are short term contracts * * *."* [15] (Emphasis supplied.) The clear implication is that Congress saw no purpose in temporarily protecting purchasers who had agreed contractually to an increase in rates. The implication is equally clear that Congress did not visualize the present circumstances where one of the contracting parties is attempting under the cover of the Act to avoid its contractual duties.

The Commission's order under review refers to Part 154 of the Commission's Regulations under the Act. Those Regulations give no assistance to the Commission's interpretation of Section 4. The very section of the Regulations under which United filed its conversion schedules [16] in May, 1952 reads as follows:

"Section 154.85 *Status of Contracts filed as rate schedules and restated.* Each contract, which is now filed as an effective rate schedule, may be continued in effect and shall be considered as an executed service agreement to the extent that the provisions thereof are not superseded by or in conflict with other applicable provisions of the rate schedules and general terms and conditions of the tariff, *until such contract expires by its presently provided terms or is replaced by an executed service agreement in a form contained in the tariff: Provided, however,* That the natural-gas company, concurrent with the filing of the tariff, shall submit, for insertion in front of each such contract, a statement identifying the provisions thereof which are not superseded by or in conflict with other applicable provisions of the rate schedules and general terms and conditions of the tariff and which are to remain in effect: *Provided, further, however, That agreements intended to effect a change or amendment in such contract may be made only by the execution of a form of service agreement contained in the tariff."* (Emphasis supplied in part.)

United's filing on June 24, 1953 did attempt "to effect a change" in an unexpired contract without "the execution of a form of service agreement contained in the tariff." This case is therefore distinguishable from Mississippi River Fuel Corp. v. Federal Power Comm., 3 Cir., 1953, 202 F.2d 899, where we held that all the filing requirements had been complied with and where there was apparently no existing filed contract. Moreover, we assumed for the purposes of that case "that the Commission has the power, implied from its authority to make rules and regulations, to reject a proposed filing which does not conform to such rules and regulations." Mississippi River Fuel Corp. v. Federal Power

---

14. The Commission points to certain evidence of the Commission's solicitor on a predecessor bill as demonstrating the intent to make filing procedure controlling irrespective of the contractual situation. There is nothing in that testimony from which it can be fairly concluded that the kind of contract before us was within the contemplation of the witness or his examiners.

15. 81 Cong.Rec. 6727 (1937).

16. There is no contention that the instant contract was changed by the conversion order replacing the percentage rate by a fixed rate. The latter as has been mentioned was substantially the same as the old percentage rate and inferentially became a part of the unchanged contract.

Comm., supra, 202 F.2d at page 901. See 18 C.F.R. Section 154.24.[17]

In view of the above language in the Commission's own Regulations and of the complete absence of suggestion in the statute or in the legislative history that the Act was intended to authorize the abrogation of existing contract rights by means of the unilateral substituted rate procedure, we hold that the Commission erred in not rejecting United's Revised Sheets Nos. 39 and 40 in so far as they affected the Ideal contract. To do otherwise would be an attempt by us to legislate judicially since the construction of 4(d) as contended for by the Commission and the intervener is not warranted by the statutory language. F.P.C. v. Niagara Mohawk Power Corp., supra. Any changes in 4(d), particularly of the radical nature urged, would be for the consideration of the Congress, not for this court.

With this holding it becomes unnecessary for us to consider Mobile's alternative contention that even if the revised schedule be accepted for filing a subsequent separate hearing be held on the lawfulness of the filing at which time the reasonableness of the prior contract rate would be passed upon. Nor do we reach Mobile's contention that the Commission should have ordered under Section 4(e) that any monies collected after the acceptance of such filing be held subject to refund. Since we are specifically holding that the pertinent part of the order of July 10, 1953 was void because the Commission had no right to accept the filing of the new schedule without first determining the reasonableness or unreasonableness of the existing contract rates any monies, if any, collected on the basis of the erroneous order were unlawfully collected and should be returned to Mobile. Baltimore & O. R. Co. v. United States, 1929, 279 U.S. 781, 49 S.Ct. 492, 73 L.Ed. 954; Restatement, Restitution, Section 74 (1937); cf. Arkadelphia Milling Co. v. St. Louis S. W. Ry. Co.,

1919, 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517.

Those parts of the Commission's order which dismissed Mobile's petition and which denied Mobile's request that the order of July 10, 1953 be amended to reject the filing of the Revised Sheets in so far as they affected the Ideal contract and which rejected Mobile's request for the Commission to issue an order amending Paragraph D of its order of July 10, 1953, which paragraph permitted the revised schedule to take effect, will be reversed.

HASTIE, Circuit Judge (dissenting).

The Commission's order of July 10, 1953 was lawful and proper under the terms and scheme of the Natural Gas Act. This court now is requiring that order to be changed in a way which, in my view, causes the Commission to exceed its authority under the Act. Accordingly, I dissent.

---

**17.** "Section 154.24 *Rejection of material submitted for filing.* The Commission reserves the right to reject any material submitted for filing which fails to comply with the requirements set forth in this part [Section 154]."