**NATURAL GAS PIPELINE COMPANY OF AMERICA, a corporation, Plaintiff,**

v.

**D. D. HARRINGTON et al., Defendants.**

**Civ. A. No. 2070.**

United States District Court
N. D. Texas, Amarillo Division.

March 9, 1956.

Clarence H. Ross, Ross & O'Keefe, Chicago, Ill., Warren T. Spies, Charles C. McDogald, Ross & O'Keefe, Chicago, Ill., D. H. Culton, Amarillo, Tex., Culton, Morgan, Britain & White, Amarillo, Tex., for plaintiff.

Hugh L. Umphres, Jr., Amarillo, Tex., David T. Searls, Gene M. Woodfin, Houston, Tex., Umphres & Umphres, Amarillo, Tex., Vinson, Elkins, Weems & Searls, Houston, Tex., for defendants.

ESTES, District Judge.

Plaintiff seeks restitution for the difference in its contract rate for the purchase of gas and the price paid under an invalid minimum rate order of the Oklahoma Corporation Commission. Plaintiff has moved for summary judgment.

The uncontroverted facts in this case are as follows:

Defendants and others under the firm name of Harrington and Marsh, called "Sellers", being the owners of mineral leases covering 78,000 acres of land in the Guyman-Hugoton gas field, in the County of Texas and State of Oklahoma, entered into a "Gas Purchase Contract" effective December 1, 1946, with plaintiff, herein called "Natural", an interstate pipeline transporter of natural gas, whereby it was agreed that (1) Natural would expand its facilities, including construction of certain pipelines and a compressor station at a point designated in the contract; (2) Sellers would drill wells, install gathering lines, construct a gasoline and dehydration plant, etc., and maintain and operate their property so as to make available for delivery the agreed quantities of gas; (3) Sellers would sell and deliver to Natural, and Natural would purchase and receive from Sellers stipulated quantities of gas per day; (4) said gas would be delivered to Natural at the intake side of its compressor station and by it compressed and redelivered to Sellers at Sellers' gasoline plant, where Sellers would remove certain constituents, including liquid hydrocarbons; (5) Sellers would redeliver the residue gas to Natural at its meter station near the outlet side of Sellers' plant, at which point title should pass to Natural; (6) Natural would pay for each thousand cubic feet of gas delivered, a base price (with certain adjustments for BTU's) of (a) until July 1, 1951, six cents, and (b) for five years thereafter, seven cents, the quantity delivered to be measured at a base temperature of 60° F. and an absolute pressure of 16.4 pounds per square inch (which prices are equal to 5.35974 cents and 6.253 cents per M.c.f. respectively for gas measured at 14.65 pounds pressure) with a slightly different price provision applying to gas used for fuel by Natural in its compressor station.

As to payment, the contract provided that Natural would render monthly statements to Seller showing the quantities of gas delivered, with supporting data, whereupon Sellers would render an invoice for such gas, and Natural would make payment; that if Natural should fail to pay any amount due, to the extent not in bona fide dispute, for a period of sixty days after its due date, Sellers could suspend deliveries of gas until such payment was made; that any statement or invoice was to be subject to correction within one year after payment made by Natural for gas delivered during any calendar month, but if claim for correction was not made within that time, such statement and invoice would become final as to both parties; that Natural might at its option make payments of any amounts due by deposit to Sellers' "credit in the First National Bank and Trust Company of Oklahoma City".

It was further provided that:

"This contract is subject to present and future valid laws and present and future lawful orders of all regulatory bodies now or hereafter having jurisdiction over the parties; and should at any time during the term of this contract either party

by force of any such law or regulation imposed, be ordered or required to do any act inconsistent with the provisions of this contract, the contract shall, subject to the other provisions hereof, continue nevertheless, but shall be deemed modified to conform with the requirements of such law or regulation."

It recited, among other things, that Natural contemplated the expenditure of large sums of money in the construction of pipelines to Sellers' properties and:

"because of such expenditures and because the nature of its business requires assurance that the gas reserves of Seller shall be continuously available to Natural during the entire period of this contract, the parties agree: that the provisions hereof shall be deemed covenants running with * * * the property * * *."

Deliveries of gas under the contract commenced in small quantities in August 1948. On about October 1, 1948, Panoma Corporation was created by the members of the Harrington and Marsh partnership, and the gas properties, together with all rights under the contract, were transferred to it. Deliveries by it of gas in substantial quantities commenced in November 1948, and continued thereafter.

This contract was an important one to both parties, and on August 1, 1952 and thereafter, the gas deliverable under it constituted a substantial portion of Natural's source of supply.

Under date of July 29, 1952, Oklahoma Corporation Commission (herein referred to as the State Commission), upon:

"application of certain mineral owners in Texas County, Oklahoma, for an order determining the minimum price at which gas in the Guyman-Hugoton Field may be first purchased or sold",

entered its order No. 26096, providing that:

"No gas shall be produced from any well located in the Guyman-Hugoton Field of Oklahoma except at a price of not less than 9.8262¢ per thousand cubic feet at the wellhead * * *. If the gas is processed for extraction of liquid hydrocarbons and sold during or at the conclusion of gathering, the price for the residue gas shall be not less than 9.8262¢ per thousand cubic feet" (with certain adjustments for BTU content).

Under this order gas was to be measured at 14.65 pounds per square inch absolute. Its effective date, August 1, 1952, was temporarily stayed by Commission order of July 31, 1952, until September 10, 1952,

"during which time the appealing parties and all other parties interested who desire to further stay the enforcement of said order may file herein their supersedeas bonds, said bonds to be approved by the Commission."

A further hearing was had on September 10, 1952 to consider the "terms, conditions and amounts" of supersedeas bonds. No supersedeas bond was filed or proffered by Natural or Panoma. Such a supersedeas was filed by another pipeline company (Northern Natural), which is material here only as indicating one form of "bond" which was acceptable to the Commission. It constituted merely an undertaking, without surety, to perform "all things that may duly and legally be enjoined upon it by said order in case said order shall be finally affirmed in whole or in part." It appears from the affidavit of the attorney who represented the mineral owner applicants for the order that this was a form of "bond" agreed to by him, and that if requested, he, as attorney for these mineral owners, would have agreed to the same form of bond for Natural.

Under date of August 26, 1952, Natural wrote Panoma, referring to Order No. 26096, and stating among other things:

"You have informed us that you interpret such order as applying to the gas sold by Panoma to this Company * * * and have also informed us that, unless payments be made by us at the minimum price set forth in such order (instead of the price set forth in such contract), you will discontinue the delivery of gas * * * to us in accordance with the provisions of such contract * * *."

The letter continued that Natural denied that the order could lawfully be applied to their gas; that it had filed notice of appeal, which it would prosecute; that pending final adjudication it was necessary that the gas be delivered to Natural in order that it might fulfill its obligations to its customers and provide supplies of gas to consuming areas served by it in accordance with its certificates of public convenience and necessity; that it could not replace said gas from any other source, on any reasonable basis; that its rights and the rights of its consuming public could not be adequately protected through the filing of a supersedeas bond; that it was necessary that its rights be protected and preserved pending the appeal; and stated:

"Natural will therefore, each month, upon receipt of proper accounting statements, pay in accordance with the contract price and, in addition thereto, will make payments for the difference between such contract price and the price fixed by the Commission for such gas in said order.

"Payments of all sums in excess of the contract price, however, will be made involuntarily and under protest because of the compulsion and coercion resulting from the threat of the order itself and your interpretation of such order as prohibiting you from producing and delivering such gas to Natural under said contract at a price less than the minimum price fixed by the Commission in such order.

"You will understand, of course, that each payment of such difference is and will be made involuntarily and under protest without an express repetition of the protest and the grounds thereof at the time of each payment. In the event such order shall be held invalid or inapplicable to the gas sold and delivered by you to us under such contract, Natural will assert the right under familiar doctrines of business compulsion, unjust enrichment and restitution to a return to Natural of the additional payments so made under protest, with lawful interest thereon."

It further suggested that by agreement the "additional amounts" be held in escrow by the bank pending final determination as to the order, all claims for interest to be waived.

Under date of August 30, 1952, the president of Panoma wrote the president of Natural, on the letterhead of Panoma, stating that Natural's letter had been submitted to "our attorneys" in Oklahoma City for recommendation and advice; that Mr. T. Murray Robinson, who was most familiar with the matter (and who, it may be noted, was the same attorney who represented the mineral owners whose application resulted in the order in question) was on vacation; that his associates were of the opinion that it would be contrary to Panoma's interests to agree to the suggested escrow agreement, but preferred to await his return before stating their objections in writing; and suggesting a different agreement, stating, "We feel that the present order will undoubtedly be sustained."

Under date of September 9, 1952, Natural wrote Panoma a second letter, identical with its letter of August 26, except that it omitted (1) the statement that its rights and the rights of its consuming public could not be adequately protected by the filing of a supersedeas bond, and (2) the suggestion for an agreed escrowing of the payments above the contract price.

Natural did appeal from the order. It was held valid in its entirety by the Supreme Court of Oklahoma April 27, 1954[1], but on appeal to the United States Supreme Court, that Court in a Per Curiam opinion[2] April 11, 1955, held the order invalid (and controlled by Phillips Petroleum Co. v. State of Wisconsin[3], decided on June 7, 1954) holding:

"that such a sale and transportation cannot be regulated by a State but are subject to the exclusive regulation of the Federal Power Commission."

Meantime, pending the appeal:

1. At Panoma's request, payments for gas delivered under the contract were made to the First National Bank and Trust Company of Oklahoma City, trustee for Panoma, until those for April, May and June 1954, which were, in accordance with Panoma's instructions, made direct to it. As provided in the contract, Natural furnished Panoma each month a statement of the quantities and BTU content of gas delivered, and Panoma submitted its invoice. Panoma's invoices, beginning with that dated September 11, 1952, for gas delivered in August 1952 showed the price per M.c.f. computed at the price fixed by the State Commission's order. Natural issued its voucher check for the amount of the invoice, showing on the voucher portion the date, aggregate amount and the words, "Payment of gas purchased during the month of ———", or similar language, and transmitted it to the payee with a letter of transmittal stating:

"Such payment is, as to any part thereof in excess of that payable under the price provisions of said contract, made involuntarily and under protest with full reservation of all rights to seek restitution thereof as is more particularly set forth in our letter to Panoma Corporation dated September 9, 1952, a copy of which is attached hereto for your information."

Each such check had printed on it the words: "acceptance of this check constitutes full payment of and settlement for the account described in the statement attached."

A schedule attached to the complaint herein, the correctness of the computation being admitted in defendant's answer, itemizes by months, from August 1952 to June 1954 inclusive; the contract price and the amount actually paid under the State Commission's order. It shows the aggregate contract price for the entire period to have been $2,827,656.48, and the aggregate amount paid under the order $4,451,426.71, an "excess" of $1,623,770.23 (the amount for which plaintiff sues). It also shows a computation of interest at 6% to July 31, 1955 on the excess of each monthly payment, totaling $178,004.32.

2. Natural made certain applications to the Federal Power Commission for increased rates and for approval of revised tariff sheets, which were allowed by that Commission by orders of December 9, 1953 and March 30, 1955. It is inferable that Natural included in support of its applications the increased price it was paying Panoma. Each of the orders of the Federal Power Commission allowing the increased rates provided for a refunding by Natural to its customers, on a basis to be approved by the Commission, of any amounts recovered by it from Panoma.

3. Panoma paid its royalty owners, and the Oklahoma production tax, on the basis of the 9.8262 cent order. From August 1, 1952 to July 1, 1954 Panoma paid to its royalty owners, because of the difference between the contract price and the 9.8262–cent price actually being received from Natural extra royalty and

1. Natural Gas Pipeline Co. of America v. Corporation Commission of Oklahoma, Okl., 272 P.2d 425.

2. Natural Gas Pipeline Co. of America v. Corporation Commission of State of Ok-lahoma, 349 U.S. 44, 75 S.Ct. 578, 99 L. Ed. 866.

3. Phillips Petroleum Co. v. State of Wisconsin, June 7, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

taxes amounting to $237,000, and extra Oklahoma production taxes amounting to $84,279. The sums so paid aggregated $321,279.

4. As of July 1, 1954, pursuant to an "Agreement and Plan of liquidation of Panoma Corporation", that corporation conveyed to its then stockholders, viz., the defendants herein, in stated unequal amounts, all of its assets including the contract with Natural. The major portion of these assets were simultaneously resold by defendants (to Dorchester Corporation) for $40,000,000 in cash and other valuable considerations. To obtain Natural's consent to this transfer, defendants made an agreement set forth in a letter dated July 1, 1954 from them to Natural, which recited the transfer of Panoma's assets in liquidation, stating that they were conveying certain of the properties referred to in Natural's letter to Panoma of September 9, 1952, and continued:

"It was understood that your execution and delivery of a certain instrument dated June 25, 1954, consenting to the assignment of the Gas Purchase Contract from Panoma Corporation to us, and from us to third persons, was contingent upon your obtaining the following agreement on our part, to-wit:

"That we hereby jointly and severally agree on behalf of ourselves, our executors, administrators and assigns to pay you or cause to be paid you any sums of money with lawful interest thereon which you are entitled to have refunded or returned with respect to the payments to Panoma Corporation in excess of the contract price made under protest referred to in said letter of September 9, 1952. We do also jointly and severally, for ourselves, our heirs, executors, administrators and assigns agree to and do hereby acknowledge and assume any obligation imposed upon Panoma Corporation by virtue of the letter you addressed to it under date of September 9, 1952."

In this suit plaintiff seeks to recover from the defendants by way of "restitution" the difference, for the period from August 1952 to June 1954 inclusive, between the aggregate amount actually paid by it for gas delivered by Panoma referable to the contract of December 1, 1946, and the aggregate amount which would have been paid on the basis of the prices fixed by the contract, with interest at 6%. The case is now before the court on two motions by the plaintiff, (1) a motion to strike certain allegations of defendants' answer as insufficient, immaterial and impertinent, and (2) a motion for summary judgment.

As I have determined to render a summary judgment on the plaintiff's motion, I deem it unnecessary to make any formal order on its motion to strike.

The facts hereinabove recited are uncontroverted. It remains to consider whether or not there is a genuine issue as to some other material fact, such that evidence thereon should be heard before proceeding to judgment. In briefs and argument, defendants urge that there is such an issue as to (1) whether or not Panoma threatened to shut down its wells unless Natural paid the increased price fixed by the order of the State Commission; (2) whether or not the price fixed by contract was noncompensatory, and (3) because the remedy of restitution is equitable in nature, "all of the surrounding facts and circumstances" should be gone into.

Plaintiff alleges that Panoma, through its counsel, informed plaintiff that it expected to comply with the order, and construed it to require discontinuance of deliveries under the contract unless payments were made at the price set forth in it. The defendants deny, alleging that Panoma did not at any time threaten or inform Natural that it would discontinue any delivery.

The affidavit of Panoma's then president states that at no time did Panoma "or any of its authorized officers, agents, attorneys, or employees inform or advise Natural * * * that in the event (Natural) did not pay the amount

in said price order provided or supersede same that Panoma Corporation would cease deliveries * * *" nor did Natural inquire of Panoma whether it would do so.

It appears from the affidavit of Panoma's attorney, Mr. T. Murray Robinson, that after the order was entered, Natural's attorney, Mr. Coleman Hayes, visited with him by telephone concerning the effect of said order on the relationship of Panoma and Natural, in the course of which conversation he told Mr. Hayes that in his "opinion as a lawyer, the order of the Commission would become binding unless superseded and that Panoma, like all the others, would be compelled to abide thereby", and that in his opinion "the order directed producers who were not receiving the minimum price to cease deliveries", and further that he "did not tell Mr. Hayes what Panoma would do, as I had no authority to so say."

Whether or not Panoma, in terms, threatened to discontinue deliveries if Natural did not meet the increased price, I do not consider to be of controlling materiality. It is uncontroverted that the order specifically forbade the production of gas from any well in the field except at the price designated; that the president of Panoma, in the letter of August 30, 1952 to the president of Natural, stated that "we feel that the present order will undoubtedly be sustained by the courts", which letter was in response to Natural's August 26, 1952 letter to Panoma stating that "you have informed us that, unless payments be made by us at the minimum price set forth in such order (instead of the price set forth in such contract) you will discontinue the delivery of gas" and contained no disavowal of such intention; that Panoma, by its vice president, on September 9, 1952, wrote Natural that Panoma, contemplating a possible revision of the contract, would invoice Natural at 9.-8262¢ for both the gas which was being delivered under this contract and certain other gas which was being delivered under a different contract providing a high-

er price, but that if the contract was not revised, "we reserve our rights to collect at a later date the difference between 9.8262¢ * * *" and the higher price for such other gas, which they later did; that when, on September 11, 1952 Panoma rendered its invoice to Natural for all gas delivered in August, it did so at the price fixed by the State Commission order, not at the contract price, and that it continued each month thereafter to render its statements to Natural on that basis for the gas delivered under the contract here in question. To the extent that any "threats" by Panoma might be thought to be essential to the existence of "business duress", I think the order itself, coupled with these uncontroverted facts, sufficiently show that Natural had a right to believe itself in imminent danger of having an important supply of gas interrupted if it did not accede to the order-fixed price, and that it was not discouraged in this belief by anything Panoma did—if, indeed, it would have been entitled to rely even on affirmative assurances from Panoma that it would violate the terms of the order by continuing deliveries at the contract price.

■ As to defendants' suggestion that there exists a genuine issue of fact on the question of whether or not the contract price was non-compensatory, I do not consider that an issue material to my decision. It is not my province to determine in this proceeding what would or would not have been a fair price for gas during the period in question. This would be true had the original price been fixed by an erroneous or invalid Commission order. See State Corporation Commission of Kansas v. Federal Power Commission.[4] And is all the more true here since the price now complained of by the defendants as non-compensatory was fixed by the arm's length contract of the parties themselves.

■ I think the suggestion that there may be other "facts and circumstances" which would make an issue in the light of the equitable character of the remedy sought by the plaintiff is too indefinite

4. 8 Cir., 215 F.2d 176.

460

to make a genuine issue as to a material fact. Counsel in argument and in response to my questions, indicated no particular material fact or circumstance which would be disputed; none are pleaded; and I believe the suggestion relates rather to the inferences and conclusions to be drawn from the uncontroverted facts already in the record than to any real dispute of fact.

As I see it, therefore, there is no genuine issue as to any material fact; the case is one for summary judgment; and it remains to consider what judgment should be rendered. Certain collateral contentions of the parties may be first considered.

■ 1. Plaintiff contends that the defendants' letter of July 1, 1954, unconditionally bound them to repay the excess payments sued for, with interest, if the order should be held invalid. I do not agree. I construe the letter only to bind the defendants to pay whatever plaintiff would be entitled to recover against Panoma, and that the questions as to recovery *vel non*, and the amount of any recovery, are the same as they would be were Panoma the defendant.

■ 2. Defendants contend that there was an accord and satisfaction as to the amount due for gas each month, and point (1) to the printed notation on the face of each of Natural's checks reading "acceptance of this check constitutes full payment of and settlement for the account described on the statement attached" and the written notation on the voucher portion of each check to the effect that it was for payment of gas purchased under the contract for a particular month, and (2) to the provisions of the contract that any statement or invoice should be subject to correction within one year but should become final "if claim for correction is not made within that time." Each of Natural's checks was accompanied by a letter renewing its rights to such restitution as set forth in its letter of September 9, 1952. It seems clear that there was no accord and satisfaction, and that the parties did not so intend.

■ 3. Defendants contend that to permit Natural to recover the difference between the contract price and what it paid for the gas pursuant to the invalid order would be enforcing the price provisions of the contract as the rate for gas during the period in question, whereas it is now known that Panoma was a natural gas company within the provisions of the Natural Gas Act, 15 U. S.C.A. § 717 et seq., whose rates could only be valid after filing with the Federal Power Commission; that the contract never having been so filed, its provisions as to price were ineffective. Admittedly, neither of the parties supposed at that time that Panoma was required to file its rate schedules (contracts) with the Federal Power Commission, and it is a matter of common knowledge that that Commission itself did not know or believe that it had jurisdiction over the prices charged by gas producers for their product until after the decision in Phillips Petroleum Co. v. State of Wisconsin, June 1954[3]. To say now that Panoma, regardless of knowledge or lack of it, was under the legal duty to file its rates (viz., its contract) with the Commission and that its failure to do so had the effect of preventing the price provisions of its private contract from becoming binding as between the parties is highly technical and without merit in determining the equities of the parties. The authorities cited by the defendants do not require such a holding. I am not here concerned with the proposition that the parties could not by their contract oust the Federal Power Commission of its power to determine the lawfulness of rates. During the period here involved the Commission has not determined the contract rates applicable to this gas unlawful, nor prescribed a change therein. I decline to follow the defendants' con-

3. Phillips Petroleum Co. v. State of Wisconsin, June 7, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035.

tention in this respect. See Mobile Gas Service Corp. v. Federal Power Commission [5], citing Colorado Interstate Gas Co. v. Federal Power Commission [6].

■ 4. Defendants further contend that recovery by plaintiff is barred (a) because Natural could have superseded the order of the State Commission and did not, (b) because Natural, by obtaining orders of the Federal Power Commission for increased rates, passed on to its customers the excess payments to Panoma, and (c) by the two-year statute of limitations, Vernon's Ann.Civ.St.Tex. art. 5526. I have carefully considered each of these contentions, and find them to be without merit. The remedy of "restitution" originated in the field of judgments paid and later reversed, and there could be no occasion for its application in a case where the judgment had been superseded. With respect to judgments, it is said in Restatement of the Law, Restitution,

Sec. 74, p. 304,[7] that "anything paid by way of settlement can be recovered * * * although the payer could have obtained a supersedeas." No reason is perceived why Natural owed any duty to Panoma to supersede the order. The suggestion that because it could have superseded, it was not put under any "business duress" by the order, if valid, would apply as well in principle to the field of judgments. As to the "passing on" by Natural to its customers, I do not consider that its rights in this suit are affected thereby, especially in view of the fact that the Federal Power Commission's orders granting it increased rates especially provide for refunds by it to its customers, of whatever amounts it should recover from Panoma. And as to the statute of limitations, the cause of action (for restitution) here asserted did not arise until the event happened on which the right to it depended, viz., the final determination of the invalidity of the State Commission's order, which was not

5. Mobile Gas Service Corp. v. Federal Power Commission, 3 Cir., 215 F.2d 883, affirmed by opinion of the Supreme Court Feb. 27, 1956 in cases Nos. 17 (United Gas Pipe Line Co. v. Mobile Gas Service Corp.) and 31 (Federal Power Comm. v. Mobile Gas Service Corp.) 76 S.Ct. 373, 377, in which Justice Harlan's opinion states:

"* * * we hold that the Natural Gas Act does not give natural gas companies the right to change their rate contracts by their own unilateral action. * * *

* * * * *

"From our conclusion that the Natural Gas Act gives a natural gas company no power to change its contracts unilaterally, it follows that the new schedule filed by United was a nullity insofar as it purported to change the rate set by its contract with Mobile and that the contract rate remained the only lawful rate. * * * Any amounts paid by Mobile in excess of the contract rates on the basis of the erroneous order of the Commission were therefore unlawfully collected, and United is obligated to make restitution of the excess payments. Cf. Baltimore & Ohio R. Co. v. United States, 279 U.S. 781, 49 S.Ct. 492, 73 L.Ed. 954."

Justice Harlan's opinion in cases Nos. 51 (Federal Power Comm. v. Sierra

Pacific Power Co.) and 53 (Pacific Gas & Electric Co. v. Sierra Pacific Power Co.), dated Feb. 27, 1956, 76 S.Ct. 368, 371, affirming 96 U.S.App.D.C. 140, 223 F.2d 605, construing provisions of the Federal Power Act virtually identical to the Natural Gas Act, states:

"* * * The Commission has undoubted power * * * to prescribe a change in contract rates whenever it determines such rates to be unlawful. While this power is limited to prescribing the rate 'to be thereafter observed' and thus can effect no change prior to the date of the order * * *.

"* * * But while it may be that the Commission may not normally *impose* upon a public utility a rate which would produce less than a fair return, it does not follow that the public utility may not itself agree by contract to a rate affording less than a fair return or that, if it does so, it is entitled to be relieved of its improvident bargain. Cf. Arkansas Natural Gas Co. v. Arkansas Railroad Comm., 261 U.S. 379, 43 S.Ct. 387, 67 L.Ed. 705."

6. Colorado Interstate Gas Co. v. Federal Power Commission, 10 Cir., 142 F.2d 943, affirmed 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206.

7. Restatement of the Law, Restitution, Sec. 74, p. 304.

until April 11, 1955, less than five months prior to the commencement of this action. Baltimore & Ohio R. Co. v. United States.[8] Accordingly, I hold against the defendants on each of these contentions.

This narrows the matter down to the controlling issues of law, viz., is Natural entitled, under the facts, to the remedy of restitution, and if so, is it entitled to recover the entire amount sued for, or are there countervailing reasons, equitable and otherwise, for limiting its recovery to a lesser amount?

I have heretofore indicated my conclusion that in making the "excess" payments Natural involuntarily did so under the coercion of "business duress". It was confronted with an apparently valid order of the State Commission which in terms forbade its supplier from supplying gas to it unless it paid the designated price. If it refused to pay, enforcement of the order would subject it to very great loss. If the order was valid, refusal to pay might be a violation of its own contract. A prior price-fixing order of the same Commission (the so-called 7-cent order of December 9, 1946) had been held valid, as against constitutional objections, by the Supreme Court [9, 10]. Natural certainly would not have been justified in ignoring the order or assuming it to be invalid. Defendants now assert that Natural should have known that Panoma would not comply with the order, because shutting down its wells would have shut off its own supply of gas for processing in its plant. Panoma's attitude at the time did not indicate that it intended to defy the order. It was quite to the contrary. But I doubt that even assurances from

it that it would do so would have entirely eliminated the coercion resulting from the order itself, containing within its own terms the implication that the State Commission would exercise its powers of enforcement. While Natural's letters to Panoma of August 26 and September 9, 1952, and its continued reiteration that it was making the excess payments under protest, could not of themselves create a cause of action for restitution, they made it clear, and make it clear now, that Natural considered itself to be paying under coercion and that Panoma was so continually and unequivocally informed.

The remedy of "restitution" is a branch of the more general "money had and received", which is based on the proposition that where one has received money from another under such circumstances as to make it unjust and inequitable for him to retain it, he may be required to restore it. In general, and with limitations, "a person who has been unjustly enriched at the expense of another is required to make restitution to the other." Restatement of the Law, Restitution, p. 12. So, "what has been lost to a litigant under the compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him, the beneficiaries of the error." See dissenting opinion of Justice Cardozo in Reed v. Allen.[11] If taxes have been paid under the duress of an unconstitutional act, they may be recovered. State v. Akin Products Co.[12] In the case cited, the Texas Supreme Court adopted the opinion of the Court of Civil Appeals, including the following language from Crow v. City of Corpus Christi[13]:

---

8. Baltimore & Ohio R. Co. v. United States, 279 U.S. 781, 49 S.Ct. 492, 73 L. Ed. 954, cited in the Supreme Court opinion in the Mobile case, Note 5 supra.

9. Cities Service Gas Co. v. Peerless Oil and Gas Co., Dec. 11, 1950, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190.

10. Phillips Petroleum Co. v. State of Oklahoma, 340 U.S. 190, 71 S.Ct. 221, 95 L. Ed. 204.

11. Reed v. Allen, 286 U.S. 191, 52 S.Ct. 532, 535, 76 L.Ed. 1054.

12. State v. Akin Products Co., Tex., Jan. 4, 1956, 286 S.W.2d 110, affirming Tex. Civ.App., 279 S.W.2d 409.

13. Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, 924, cited in the Supreme Court opinion in the Mobile case, Note 5 supra.

"The early common-law doctrine of duress has been expanded (17 Am.Jur., p. 875) and many courts have adopted the modern doctrine of 'business compulsion,' under which 'it is established that where by reason of the peculiar facts a reasonably prudent man finds that in order to preserve his property or protect his business interest it is necessary to make a payment of money which he does not owe and which in equity and good conscience the receiver should not retain, the payment may be recovered.' 40 Am.Jur., p. 831."

The principle of business duress has been applied to permit recovery of payments made under compulsion of an administrative order later held invalid. Baltimore & Ohio R. Co. v. United States [14], Mobile Gas Service Corp. v. Federal Power Commission [15]. I hold that it is applicable here, and that Natural, is entitled to recover the excess payments, except to the extent that countervailing equities make it unjust for it to do so. The remedy of restitution is not a rigid legal right, and in applying it I conceive it to be the court's duty to limit the recovery to the amount which, under the circumstances, in equity and good conscience, should be restored.

"The claimant, to prevail, must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it. * * *

"The question no longer is whether the law would put him in possession of the money if the transaction were a new one. The question is whether the law will take it out of his possession after he has been able to collect it. * * *

" * * * 'Restitution is not of mere right. It is *ex gratia*, rest-ing in the exercise of a sound discretion * * *.'" Cardozo, J., in Atlantic Coast Line R. Co. v. State of Florida.[16]

I hold that there are countervailing equities to the extent of $321,279, being $237,000 paid by Panoma to its royalty owners as royalty and $84,279 paid by it as increased gross production taxes, out of and by reason of the "excess payments" by Natural. These amounts were not retained by Panoma, but were paid out by it, and in my opinion necessarily so. To have withheld payment of royalty on a portion of the amount currently being paid for the gas by Natural would almost certainly have precipitated difficulties with the royalty owners, possibly to the extent of claims for cancellation of leases, avoidance of which inured to Natural's benefit. In making its payments, Natural is bound to have known that Panoma would have to pay out a part of the "excess payments" as royalties and gross production taxes. I believe it to be just and equitable to reduce the recovery allowed Natural in this case below the entire amount sued for, by the sum of $321,279.

I cannot, however, follow the suggestion of defendants that I should also take into account some $412,000 in royalties and taxes paid out by Panoma prior to August 1, 1952, by reason of the difference between the contract price and the price promulgated by the State Commission in its prior order of December 9, 1946 (the so-called "7-cent" order). Natural made no payments above the contract price prior to August 1, 1952, nor by reason of the 7-cent order, and the amounts so paid out by Panoma have no connection with the restitution sued for.

As to the matter of interest, I have concluded that it is just and equitable, under the circumstances of this case, to

14. Baltimore & Ohio R. Co. v. United States, 279 U.S. 781, 49 S.Ct. 492, 73 L.Ed. 954.

15. Mobile Gas Service Corp. v. Federal Power Comm., 3 Cir., 215 F.2d 883, af-firmed by the Supreme Court 76 S.Ct. 373. See Note 5 supra.

16. Atlantic Coast Line R. Co. v. State of Florida, 295 U.S. 301, 55 S.Ct. 713, 716, 79 L.Ed. 1451.

deny plaintiff's claim for interest. In so concluding, I have taken into account all the facts and circumstances before me, including the fact that Natural could have superseded the operation of the order as to this gas, and kept the use of the money, by filing a mere undertaking without surety or penal amount (as did Northern Natural Gas Company); that it was willing to waive interest if Panoma would agree to the escrowing of the excess payments; and that for most of the period in question it has been able to recoup the excess payments by increased rates to its customers, so that it has not in fact been deprived of the use of the money.

I therefore hold that Natural is entitled to recover from the defendants the sum of $1,302,491.23, with interest only from the date of the judgment. In view of the defendants' letter agreement of July 1, 1954, I hold further that this recovery shall be from the defendants jointly and severally.

Counsel for plaintiff may submit a form of judgment, for consideration after notice to counsel for defendants.